**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Alan Keith Levesque,<br><br>                                          Debtor(s). | C/A No. 20-03330-EG<br><br>Adv. Pro. No. 22-80008-EG<br><br>Chapter 7<br><br>**ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| Michelle Vieira, Chapter 7 Trustee for Alan Keith Levesque,<br><br>                                          Plaintiff(s),<br><br>v.<br><br>Think Tank Logistics, LLC<br>IGL Logistics, Inc.<br>James Burke,<br><br>                                          Defendant(s). | |

**THIS MATTER** is before the Court on cross motions for summary judgment filed by Michelle Vieira, Chapter 7 Trustee for Alan Keith Levesque ("Plaintiff" or "Trustee") and Defendants, Think Tank Logistics, LLC, IGL Logistics, Inc., and James Burke ("Defendants").[1] Each party objected to the opposing motion,[2] and the Court conducted a hearing on the motions on March 7, 2023. For the reasons set forth below, the motions are denied.

**STATEMENTS OF FACT**

Alan Keith Levesque ("Levesque"), the Chapter 7 Debtor in the underlying bankruptcy case, and Defendant James Burke ("Burke") were business partners and co-owners of Think Tank Logistics, LLC ("TTL") and IGL Logistics, Inc. ("IGL").[3]

---

[1] ECF No. 28 (Defendants' Mot. for Summ. J.), filed Jan. 3, 2023; ECF No. 30 (Trustee's Mot. for Summ. J.), filed Jan. 30, 2023.
[2] ECF Nos. 35 and 36, filed Feb. 13, 2023.
[3] Compl. ¶ 13; Answer ¶ 2.

1

TTL was engaged in the business of logistics and supply chain management.[4] TTL was organized under the laws of North Carolina on April 28, 2017,[5] and its original members were Burke (34% interest), Levesque (33% interest), and Adam Lawrence (33% interest).[6] Following a dispute between the members,[7] which was settled on or about August 29, 2018,[8] Burke and Levesque bought out Adam Lawrence's membership interest in TTL for $140,000.00, after which Burke held a 51% and Levesque held a 49% interest in the company.[9] At all relevant times related to this action, Burke was the manager of TTL.[10]

IGL is a carrier-based logistics company.[11] IGL was incorporated under the laws of North Carolina on or about February 9, 2018.[12] Burke and Levesque were the sole shareholders of IGL, with Burke holding 51% of the shares and Levesque holding 49% of the shares.[13] At all relevant times related to this action, Burke was the President and majority shareholder of IGL.[14]

In April of 2019, TTL's business suffered a hardship and a temporary downturn in revenue when its relationship with one of its customers was terminated.[15] During this same time period, Levesque was also having marital difficulties and personal financial problems.[16] Burke had requested that Levesque put capital into IGL, but Levesque did not have the ability to make a

---

[4] Compl. ¶¶ 12, 25. From the pleadings filed to date, it is not entirely clear whether TTL is still operating or whether its operations technically merged with those of IGL.
[5] Compl. ¶ 11; Answer ¶ 2.
[6] Compl. ¶ 13; Answer ¶ 2.
[7] Compl. ¶ 15; Answer ¶ 2.
[8] Compl. ¶ 20; Answer ¶ 4.
[9] Compl. ¶ 22; Answer ¶ 4.
[10] Compl. ¶ 14; Answer ¶ 2.
[11] Compl. ¶ 25; Answer ¶ 58 ("IGL was to lease trucks, warehouse space and operate as the primary broker for Think Tank."); Levesque Dep., at p. 61 (Ex. 28).
[12] Ex. 1 to Mem. in Support of Trustee's Mot. for Summ. J. (Articles of Incorporation of IGL); Answer ¶ 55. Unless otherwise specified, references to exhibits are to the exhibits attached to the Memorandum in Support of the Trustee's Motion for Summary Judgment (ECF No. 31).
[13] Compl. ¶ 26; Answer ¶ 7.
[14] Compl. ¶ 27; Answer ¶ 7.
[15] Answer ¶ 73. While the Complaint alleges that IGL lost the customer, Defendants allege in their answers that TTL lost the customer. Regardless, as a result of the customer's cancellation of its contracts, both TTL and IGL felt a negative financial impact.
[16] Levesque Dep., p. 107-108 (Ex. 7).

capital contribution.[17] Levesque approached Burke to ask if he could exchange his interest in the companies since they were not able to take distributions at that time and he needed income.[18] Levesque became concerned about becoming liable for the two companies' debts.[19] Eventually, Burke offered Levesque an opportunity to work with Logistics Link, a separate company with which Burke was affiliated. On April 15, 2019, Levesque began working for Logistics Link and earning a salary.[20]

On May 31, 2019, TTL, Burke, and Levesque entered into a Membership Interest Redemption Agreement ("Think Tank Agreement"). On the same date, IGL, Burke, and Levesque entered into an Ownership Interest Redemption Agreement ("IGL Agreement" and, collectively with the Think Tank Agreement, the "Redemption Agreements").[21] The Redemption Agreements, which expressly indicate "shall be construed and governed in accordance with the laws of the State of North Carolina," contain nearly identical provisions. Among other things, they provide for the transfer of Levesque's 49% interest in both TTL and IGL back to the respective companies.[22]

The Redemption Agreements acknowledged that TTL and IGL would combine operations and that the transfer of Levesque's interest in the respective companies was being made "in lieu of contributing his proportionate share of the necessary capital" needed for TTL and IGL to operate, that Burke would provide all of the additional capital needed for the combined companies, and that Burke was "unwilling to contribute the additional capital unless he is the sole owner of Think Tank and IGL." The transfer of Levesque's 49% interest in TTL and IGL, respectively, was for $10.00

---

[17] Levesque Dep., p. 107-109 (Ex. 7).
[18] Levesque Dep., p. 30 (Ex. 5); 107-109 (Ex. 7).
[19] Levesque Dep., p. 107-109 (Ex. 7).
[20] Letter Resp. to Logistics Link Subpoena (Ex. 8).
[21] Compl. ¶ 33; Answer ¶ 9; Think Tank Agreement (Ex. 11); Compl. ¶ 36; Answer ¶ 9, IGL Agreement (Ex. 12).
[22] Compl. ¶ 34; Answer ¶ 9; Think Tank Agreement (Ex. 11); IGL Agreement (Ex. 12).

3

each.[23] As a result of these transfers, Burke obtained 100% ownership of TTL and IGL.[24] By entering into the Redemption Agreements, Burke and Levesque agreed they shall each be responsible for fifty percent (50%) of TTL's and IGL's debts, expenses, and other obligations incurred prior to the date of the respective agreements in the event that the companies were not able to satisfy those obligations in full.

According to a deposition transcript attached in support of Trustee's motion, Debtor testified that he sold his interest in the companies for $10.00 each and that there was no other exchange for the relinquishing of his ownership interest.[25] He further testified that he believed his share of the necessary capital contribution for the combined companies would have been approximately $150,000.00 if he had not relinquished his ownership interest in the companies. Prior to the execution of the Redemption Agreements, Levesque was not personally liable for the companies' debts under the Operating Agreement for Think Tank, the corporate governance documents for IGL, or North Carolina law.[26] *See* N.C. Gen. Stat. §§ 55-6-22, 57D-3-30.[27]

At the time of the execution of the Redemption Agreements, Levesque was indebted to Merritt Enterprises, LLC.[28] Levesque filed a voluntary petition for relief under Chapter 7 of the

---

[23] Exs. 11 & 12. Both Redemption Agreements state that "[i]n exchange for the Levesque Interest, [the company] agrees to pay Levesque the sum of $10.00, contemporaneously with the execution of this Agreement."
[24] Compl. ¶¶ 35 and 38; Answer ¶ 9.
[25] Levesque Dep., p. 16 (Ex. 14).
[26] Operating Agreement, p. 4 (Ex. 15); Articles of Incorporation (Ex. 1) and IGL By-Laws (Ex. 16).
[27] TTL's Operating Agreement states that "[m]embers are not obligated to make additional Capital Contributions unless unanimously agreed by all the Members." Operating Agreement at § 2.2 (Ex. 15). Section 2.6 of the Operating Agreement further provides:
> A Member will not be bound by, or be personally liable for, the expenses, liabilities, debts, contracts, or obligations of the Company, except as otherwise provided in this Agreement or as required by the North Carolina Limited Liability Company Act. Unless expressly provided in this Agreement, no Member, acting alone, has any authority to undertake or assume any obligation, debt, or responsibility, or otherwise act on behalf of, the Company or any other Member.

Likewise, nothing in the corporate governance documents for IGL requires shareholders to make financial contributions to the company. *See* Articles of Incorporation (Ex. 1) and IGL By-Laws (Ex. 16).
[28] Complaint, *Merritt Enters. v. Levesque et al.*, No. 2018CP4201314 (S.C. Ct. Com. Pl. Apr. 17, 2018) (Ex. 19). Merritt Enterprises seeks damages from the defendants, jointly and severally, in the amount of $66,500.00 plus costs and prejudgment interest.

Bankruptcy Code on August 21, 2020, less than fifteen (15) months after transferring his ownership interests in TTL and IGL to Burke.[29] As of the petition date, Merritt Enterprises, LLC continued to hold an allowable unsecured claim against Levesque; accordingly, the Trustee claims that a triggering creditor exists to grant her standing for the fraudulent conveyance actions.[30]

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding involves claims for damages under non-bankruptcy law and therefore is not a "core proceeding" within the meaning of 28 U.S.C. § 157(b)(2). Nevertheless, the Court may make final determinations in this matter because the parties have expressly consented to this Court's entry of final orders and judgments. 28 U.S.C. § 157(c); *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015).[31]

## SUMMARY JUDGMENT STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32] When deciding whether to grant or deny a motion for summary judgment, "[t]he pertinent inquiry is whether 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Reyazuddin v. Montgomery Cty., Md.*, 789 F.3d 407, 413 (4th Cir. 2015).

The nonmoving party bears the burden of demonstrating there is a genuine issue of material fact for trial. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). "The

---

[29] Bankr. Pet. (Ex. 21); ECF No. 1 (C/A No. 20-03330-EG).
[30] Proof of Claim #8, C/A No. 20-03330-EG (Ex. 18).
[31] Adversary Proceeding Report, ECF No. 7, filed Apr. 25, 2022.
[32] Fed. R. Civ. P. 56 is made applicable to this proceeding by Fed. R. Bankr. P. 7056.

5

nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings." *Id.* (*quoting Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The evidence presented must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). A genuine dispute of material fact exists "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Fusaro v. Howard*, 19 F.4th 357, 366 (4th Cir. 2021) (citing *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 354 (4th Cir. 2011)). Accordingly, the Court will address each motion in turn.

### I.    Defendants' Motion for Summary Judgment

The Complaint alleges eight causes of action against Defendants, all of which arise from the same factual allegations relating to Levesque's transfer of his interest in TTL and IGL through his execution of the Redemption Agreements:

1. Avoidance of the TTL transfer pursuant to 11 U.S.C. § 544 and S.C. Code Ann. § 27-23-10 ("Statute of Elizabeth");

2. Avoidance of the TTL transfer pursuant to 11 U.S.C. § 548(a)(1)(B);

3. Avoidance of the TTL transfer pursuant to 11 U.S.C. § 544 and N.C. Uniform Voidable Transactions Act;[33]

---

[33] The Trustee has sought to avoid the transfers of Levesque's interests in TTL and IGL under both North Carolina and South Carolina law. It remains unclear to the Court which law applies to the transfers. The Trustee argues that the South Carolina Statute of Elizabeth is applicable because Levesque is a South Carolina resident, his creditors are predominantly South Carolina creditors, and the Statute of Elizabeth is designed to regulate conduct of South Carolina residents. Since the Court finds there are genuine issues of material fact remaining for trial on these claims, it is unnecessary to resolve the choice of law issue at this time.

6

4. Avoidance of the IGL transfer pursuant to 11 U.S.C. § 544 and S.C. Code Ann. § 27-23-10;

5. Avoidance of the IGL transfer pursuant to 11 U.S.C. § 548(a)(1)(B);

6. Avoidance of the IGL transfer pursuant to 11 U.S.C. § 544 and N.C. Uniform Voidable Transactions Act;

7. Recovery of the Avoided Transfers pursuant to 11 U.S.C. § 550; and

8. Breach of Fiduciary Duty.

Defendants seek summary judgment as to all eight causes of action.

As to the first six causes of action, Defendants argue that summary judgment is proper because Plaintiff has no evidence of what Levesque's 49% interest in the companies was at the time the Redemption Agreements were entered into—or at any other time for that matter; thus, the Trustee cannot carry her burden at trial that the transfer was voluntary or not for a reasonably equivalent value. The value of the interest Levesque transferred, Defendants argue, is essential to establish a claim under the Statute of Elizabeth, the NC Uniform Voidable Transactions Act (N.C. Gen. Stat. § 39-23.5), and 11 U.S.C. § 548. Said simply, Defendants' argument with respect to the first six causes of action is as follows: "Plaintiff has not and cannot show that the $10.00 recited in the agreement is grossly inadequate consideration. If something is worth less than $10.00, paying $10.00 is more than sufficient consideration."[34] Defendants seem to hang their argument also on the fact that the Trustee's expert—whose testimony they argue is the only evidence that the Trustee could possibly present at trial concerning the value of the transferred interests—did not value TTL, which they claim was dissolved at some point in 2019 and, as it relates to IGL, the Trustee's expert valued 100% of the company but did not value solely Levesque's 49% interest.[35]

---

[34] ECF No. 35, p.3.
[35] ECF No. 28, p.13.

7

For the reasons set forth below, the Court is not persuaded by Defendants' argument that a material issue of fact as to the value of the transfer does not exist at this stage of the proceeding.

### a. *Statute of Elizabeth Causes of Action (First and Fourth Causes of Action)*

The Trustee disagrees with Defendants that she is required to prove the value of the property transferred, arguing that the focus of the inquiry is instead whether the transfer was "without valuable consideration." She contends that Levesque received nominal consideration, which is not valuable consideration as a matter of law. Alternatively, the Trustee argues that there is, *at a minimum*, a genuine issue of fact as to whether Levesque received valuable consideration in exchange for the redemption of his interest in TTL and IGL, which precludes summary judgment as to the Statute of Elizabeth causes of action. The Court agrees with the Trustee that a material issue of fact exists.

Section 27-23-10 of the South Carolina Code, commonly known as the Statute of Elizabeth, provides:

> Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10. "Under the Statute of Elizabeth, existing creditors may avoid transfers under an actual fraudulent transfer theory or under a constructive fraud theory." *In re Genesis Press, Inc.*, 559 B.R. 445, 453 (Bankr. D.S.C. 2016) (citing *In re J.R. Deans Co., Inc.*, 249 B.R.

121, 130 (Bankr. D.S.C. 2000). Avoidance of a transfer under a constructive fraud theory does not require proof of actual intent to defraud creditors. *Id.* at 453 (citing cases). When a trustee steps into the shoes of a creditor pursuant to 11 U.S.C. § 544 and seeks to avoid a constructively fraudulent transfer under the Statute of Elizabeth, the trustee must establish (1) the transferor/grantor was indebted to the creditor at the time of the transfer; (2) the conveyance was voluntary; and (3) the transferor/grantor failed to retain sufficient property to pay the indebtedness to the creditor in full—not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt. *Id.* The South Carolina Supreme Court has clarified that a transfer is "voluntary" when it is gratuitous. *Royal Z Lanes, Inc. v. Collins Holding Corp.*, 337 S.C. 592, 595, 524 S.E.2d 621, 622 (1999). A voluntary conveyance has been further defined as "*a conveyance made upon a mere nominal consideration or without consideration.*" *In re Amelung*, 436 B.R. 806, 810 (Bankr. D.S.C. 2010) (quoting *First State Sav. and Loan Ass'n v. Nodine*, 291 S.C. 445, 450, 354 S.E.2d 51, 54 (Ct. App. 1987)) (emphasis in original).

The Trustee argues that the $10.00 consideration received by Levesque in exchange for the transfer of his ownership interests in each company was "nominal" consideration and that nominal consideration is "without valuable consideration" as a matter of law. "Nominal" is defined as "existing in name only" or, with respect to a price or amount, "trifling, [especially] as compared to what would be expected." *Nominal*, Black's Law Dictionary (11th ed. 2019). The Trustee cites cases which support this proposition. *See In re Haddock*, 246 B.R. 810, 815 (Bankr. D.S.C. 2000) (concluding that $5.00 plus love and affection was nominal consideration and was therefore a voluntary transfer); *Audio Invs. v. Robertson*, 203 F.Supp.2d 555, 560 (D.S.C. 2002) (concluding that $10.00 was nominal consideration for transfers of real property and therefore was a transfer "without valuable consideration"); *Erskine v. Erskine*, 107 S.C. 233, 92 S.E. 465, 466 (1917)

9

(concluding that $10.00 was nominal consideration and therefore did not constitute valuable consideration). "Valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit, accruing to the one party, or some forbearance, detriment, loss, responsibility given, suffered, or undertaken by the other." *In re Hanckel*, 512 B.R. 539, 549 (Bankr. D.S.C. 2014) (quoting *Furman Univ. v. Waller*, 117 S.E. 356, 358 (S.C. 1923)).

Defendants, on the other hand, argue that the Court must examine the *value of the property transferred* to determine whether the transfer was made without valuable consideration. Defendants further assert that the Trustee bears the burden of demonstrating that the consideration was "grossly inadequate."[36] To determine whether the consideration was "grossly inadequate," Defendants contend that the Trustee must prove the value of Levesque's 49% interest in the companies to defeat summary judgment and, because there is no evidence of the value of Levesque's 49% interest in either company, summary judgment is proper.

From the outset, the Court notes that Defendants' assertion that the Court must determine whether the consideration received was "grossly inadequate" is an incorrect interpretation of the applicable law. The Supreme Court of South Carolina has specifically rejected the argument that gross inadequacy of consideration causes a transfer to be made without consideration, concluding "gross inadequacy of consideration and 'without consideration' are not synonymous in the law." *Royal Z Lanes*, 524 S.E.2d at 622 (overruling *Dufresne v. Regency Realty, Inc.*, 366 S.E.2d 256 (S.C. Ct. App. 1987), which treated a conveyance as voluntary (gratuitous), to the extent that the value of the property exceeded the consideration given). Gross inadequacy of consideration does not render a conveyance voluntary or gratuitous; rather, the inadequacy of the consideration

---

[36] ECF No. 28, p.4.

10

exchanged for the transfer of property is treated as a "badge of fraud," and actual intent must be proven. *See In re Hanckel*, 512 B.R. at 548 (citing *Royal Z Lanes*, 524 S.E.2d at 622-23).

Defendants also appear to be asserting that the companies had no value at the time of the transfers and therefore $10.00 in exchange for Levesque's interests in each company was valuable consideration. They further argue that there was other consideration received by Levesque in connection with the transfers of his interests in the companies, including but not limited to loan forgiveness and releases from liability. On the other hand, the Trustee has presented evidence indicating that the stated consideration of $10.00 was nominal consideration,[37] that Levesque assumed liability for significant corporate debt in connection with the transfers,[38] and that the companies were valued in excess of $6 million at the time of the transfers—as of May 31, 2019.[39]

The Court cannot simply consider what the Debtor received in exchange for the redemption of his interests in the companies <u>or</u> the value of the property transferred—an analysis of whether a conveyance was voluntary for purposes of the Statute of Elizabeth appears to require an overall analysis of what was transferred, its value, <u>and</u> the consideration received. *See, e.g., Groves v. Daffin*, No. 8:13-19-BHH, 2016 WL 638817, at *3 (D.S.C. Feb. 17, 2016) (considering the amount of the mortgage on the property and the equity possessed in the property at the time of the transfer and finding that, given the equity of over a million dollars, a transfer involving $5 was without consideration). To do otherwise at this stage of the case would in essence be making a decision in a vacuum.

---

[37] Defendants admitted that the $10.00 stated as consideration on each agreement was "nominal." ECF No. 4 (Defs.' Answer, ¶ 81.8).
[38] Ex. 11 & 12 (Membership Interest Redemption Agreements for TTL and IGL).
[39] Nowell Dep., p. 47, Ex. 27.

Viewing the facts in the light most favorable to the Trustee, the Court finds that there is a genuine issue of material fact as to whether Levesque received valuable consideration in exchange for the transfer of his interests in the companies; therefore, summary judgment is denied as to the first and fourth causes of action under the Statute of Elizabeth.

    **b.** ***11 U.S.C. § 548(a)(1)(B) and N.C. Uniform Voidable Transactions Act Claims (Second, Third, Fifth, and Sixth Causes of Action)***

Defendants similarly argue that the Trustee must demonstrate the value of the property transferred to establish that Levesque did not receive "reasonably equivalent value" in exchange for the transfer to establish a claim under 11 U.S.C. § 548(a)(1)(B) or the N.C. Uniform Voidable Transactions Act (UVTA). Section 548(a)(1)(B) provides in relevant part as follows:

> The trustee may avoid any transfer … of an interest of the debtor in property… that was made … on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily ... received less than a reasonably equivalent value in exchange for such transfer….

11 U.S.C. § 548(a)(1)(B)(i).

When evaluating an avoidable transfer claim under 11 U.S.C. § 548(a)(1)(B), the Fourth Circuit has explained that the determination of "reasonably equivalent value" requires the court to "focus…on the consideration received by the debtor, not on the value given by the transferee." *In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J. 55, 80 (1991)). The Court must examine the net effect of the transfers on the debtor's estate and the funds available to the unsecured creditors. *Id.* at 485. "The purpose of the Bankruptcy Code's avoidance provisions is to prevent a debtor from making transfers that diminish the bankruptcy estate to the detriment of creditors." *Grayson Consulting, Inc. v. Wachovia Sec., Inc. (In re Derivium Capital LLC)*, 716 F.3d 355, 361 (4th Cir. 2013). If the unsecured creditors are no worse off because the debtor (and

thus the estate) received an amount reasonably equivalent to what it paid, no fraudulent transfer has occurred. *In re Jeffrey Bigelow Design Grp., Inc.*, 956 F.2d at 484.

Had these transfers not occurred, it appears that Levesque's 49% interests in the companies would have been available to be sold by the Trustee for the benefit of Levesque's creditors.[40] Since the Trustee has presented evidence indicating the companies—or at least IGL—were valued in excess of $6 million[41] at the time of the transfers and that Levesque (and consequently, the estate) appears to have received only nominal consideration of $20.00 in total for both, it appears that a reasonable trier of fact could conclude that the unsecured creditors were worse off as a result of the transaction.[42] Defendants argue that there is no evidence of a lack of reasonably equivalent value because the Trustee's expert did not value Levesque's 49% interest and instead valued the entire company. However, Defendants did not present any case law or authority supporting their argument and indicating that the Trustee was required to establish the specific value of Levesque's 49% interest instead of establishing the value of the companies as a whole at the time of the transfers.[43] As discussed above, the Court finds there is a genuine issue of material fact as to whether Levesque in fact received valuable consideration in exchange for the transfer of his interest in the companies, and that there is also a genuine issue of material fact as to whether the

---

[40] As previously mentioned, it is not entirely clear to the Court whether TTL is still in existence or if there exists a membership interest—or value—that can be returned to the Trustee for distributions to creditors. This issue, while it will become important at the trial phase, does not impact the Court's decision with respect to the motions presently before the Court.

[41] Nowell Dep., p. 47, Ex. 27.

[42] To be clear, the Court is not drawing any conclusion or making any determination at this time regarding the value—or the point in time relevant for the valuation of a transferred asset—that the estate would recover if the Trustee were to prevail at trial, the transfers were avoided, and the Court determined that the value of Levesque's interest, rather than the actual shares, had to be returned.

[43] The Trustee has cited cases where courts have determined the value of a partial interest in a company by simply calculating the ownership percentage of the whole value of the company. *See Santee Oil Co., Inc. v. Cox*, 217 S.E.2d 789 (S.C. 1975) (affirming the trial court's valuation of a 37.5% minority interest in a company that was calculated by taking 37.5% of the value of the company as a whole); *Hendley v. Lee*, 676 F.Supp. 1317 (D.S.C. 1987) (valuing a 50% interest in a company for purposes of a forced buyout by taking 50% of the fair value of the shares of stock of the company).

estate received reasonably equivalent value in exchange for the transfer of his interests in the companies. Accordingly, summary judgment must also be denied as to the third and fifth causes of action pursuant to § 548(a)(1)(B).

North Carolina's UVTA provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a *reasonably equivalent value* in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

N.C. Gen. Stat. § 39-23.5(a) (emphasis added). Like § 548(a)(1)(B), whether the transfer was made for "reasonably equivalent value" is an essential element of a claim under North Carolina's UVTA. *See Gen. Fid. Ins. Co. v. WFT, Inc.*, 837 S.E.2d 551, 557 (N.C. Ct. App. 2020). The analysis is substantially the same: the determination of whether reasonably equivalent value was provided requires the court to "examine the net effect of the transaction on the debtor's estate and whether there has been a net loss to the debtor's estate as a result of the transaction." *Id.* Accordingly, for the same reasons set forth above, summary judgment must also be denied as to the third and sixth causes of action arising under North Carolina's UVTA.

### c.    *11 U.S.C. § 550 Claim (Seventh Cause of Action)*

Defendants argue that the seventh cause of action—the recovery of the avoided transfers pursuant to 11 U.S.C. § 550—is contingent on the success of the first six causes of action, and because Defendants believe they should be successful on those actions, it would follow that they should also prevail on their summary judgment motion with respect to the seventh cause of action. Because the Court has concluded that summary judgment is not appropriate regarding the first six causes of action for the reasons set forth above, it likewise concludes that summary judgment

should be denied for the seventh cause of action, given that its viability depends on the success of the earlier causes of action.

### d.     *Breach of Fiduciary Duty Claim (Eighth Cause of Action)*

Finally, the Trustee alleges that Defendant Burke violated his fiduciary duty to Levesque by squeezing him out of TTL and IGL, leading him to believe that capital contributions were required for ongoing operation of the companies, that he was responsible for the debts of the companies, and that his ownership interests had no value. Defendants argue that summary judgment is proper for the eighth cause of action—breach of fiduciary duty—because there was no fiduciary relationship between Burke and Levesque, there is no evidence that Burke did not act in good faith and with due regard for Levesque's interests, and there is no evidence that Burke's conduct caused injury to Levesque.

"To establish a claim for breach of fiduciary duty, claimants are required to produce evidence that (1) defendants owed them a fiduciary duty of care; (2) defendants … violat[ed]… their fiduciary duty; and (3) this breach of duty was a proximate cause of injury to plaintiffs." *French Broad Place, LLC v. Asheville Sav. Bank, S.S.B.*, 816 S.E.2d 886, 899 (N.C. Ct. App. 2018) (citing *Farndale Co., LLC v. Gibellini*, 628 S.E.2d 15, 20 (N.C. Ct. App. 2006)).

Under North Carolina law, "[m]ajority shareholders owe fiduciary duties to minority shareholders." *Johnston v. Johnston*, No. 18 CVS 4784, 2018 WL 6017648, at *10 (N.C. Super. Ct. Nov. 15, 2018) (citing *Gaines v. Long Mfg. Co. (Gaines II)*, 234 N.C. 340, 344, 67 S.E.2d 350, 353 (1951)); *see also Freese v. Smith*, 428 S.E.2d 841, 847 (N.C. 1993).[44] These fiduciary duties

---

[44] The North Carolina Limited Liability Company Act "does not create fiduciary duties among members." *Kaplan v. O.K. Techs. L.L.C.*, 675 S.E.2d 133, 137 (N.C. Ct. App. 2009). However, North Carolina courts have found an exception to this rule, finding that a controlling member owes a fiduciary duty to minority members. *Id.; see, e.g., Fiske v. Kieffer*, No. 15–CVS–11575, 2016 WL 916321, at *4 (N.C. Super. Ct. Mar. 9, 2016); *Zagaroli v. Neill*, No. 15 CVS 2635, 2016 WL 7478668, at *7 (N.C. Super. Ct. Dec. 29, 2016).

arise "regardless of whether the majority shareholder is an individual or an entity acting through individuals." *Id.* The Trustee has presented evidence demonstrating that Burke was the majority shareholder and President of IGL and majority member and manager of TTL,[45] holding 51% of the ownership interest of each company, and as such, he had complete control over the companies. The evidence further indicates that Levesque was the minority shareholder of IGL and minority member of TTL, holding only a 49% interest in the companies. Accordingly, the Court finds there is sufficient evidence demonstrating that Defendant Burke owed a fiduciary duty to Levesque under North Carolina law.

Levesque's deposition testimony establishes that prior to the transfers, Defendant Burke requested that Levesque make a capital contribution and told Levesque that he could not take distributions or receive a salary. Levesque's deposition testimony further indicates that he believed he was responsible for the debts of the companies and that the companies had no value at the time of the transfers. The evidence indicates that Levesque was prompted to seek redemption of his interests in the companies for only $10.00 per company based upon his belief founded on representations made by Defendant Burke that he was unable to receive personal income from the companies and would be required to contribute $150,000.00 in capital. The evidence further shows that Defendant Burke retained and solely communicated with the attorneys who prepared the transfer agreements which required Levesque to assume responsibility for company debts for which he was not previously responsible. The evidence presented indicates that the companies were worth in excess of $6 million at the time of the transfers. As discussed above, the Court has previously determined that there is a genuine issue of material fact regarding whether Levesque

---

[45] Ex. 1.

16

received valuable consideration in exchange for transferring his interests back to the companies, the effect of which allowed Defendant Burke to become 100% owner of both companies.

The duties owed by a majority shareholder under North Carolina law include the duty to pay over to the minority shareholder his "just proportion of the income and of the proceeds of corporate property." *Gaines II*, 57 S.E.2d at 353. If Levesque did not receive valuable consideration in exchange for his shares, it appears that a reasonable trier of fact could conclude that Defendant Burke, as the majority equity owner of the companies, breached this duty to provide Levesque with his fair share of the value of the companies. Under North Carolina law, it appears that once the fairness of Defendant Burke's actions—as majority shareholder and member—has been challenged, he would have the burden to prove that his actions "were in all respects inherently fair to the minority and undertaken in good faith." *Loy v. Lorm Corp.*, 278 S.E.2d 897, 901 (N.C. Ct. App. 1981). The Court finds that a genuine issue of material fact exists as to whether Defendant Burke breached his fiduciary duties owed to Levesque; accordingly, summary judgment is denied as to the eighth cause of action.

### II.     Trustee's Motion for Summary Judgment

The Trustee seeks summary judgment as to the first cause of action for constructive fraud under South Carolina's Statute of Elizabeth regarding the TTL transfer and as to the fourth cause of action for constructive fraud under South Carolina's Statute of Elizabeth (S.C. Code Ann. § 27-23-10) regarding the IGL transfer.[46] As discussed above in connection with Defendants' motion for summary judgment on these two claims under the Statute of Elizabeth, the Court has

---

[46] Defendants objected to the Court's consideration of Defendant Burke's 2004 examination in connection with the Trustee's motion for summary judgment. The Trustee stated that Defendant Burke's testimony from his 2004 examination was not necessary for purposes of deciding the motion and mainly provided factual background information unrelated to the elements that need to be decided. Accordingly, the Court has not considered testimony from Defendant Burke's 2004 examination for purposes of deciding this motion. Nevertheless, even if the 2004 examination testimony was considered, the Court finds that it would not alter the conclusions of this Order.

17

determined that a genuine issue of material fact exists regarding whether the conveyance from Levesque was "voluntary," meaning that Levesque's transfer of his interests in TTL and IGL was made upon mere nominal consideration or without consideration. Considering the Trustee's motion for summary judgment and viewing the facts in the light most favorable to the Defendants, the Court finds that a genuine issue of material fact as to this element of the Trustee's claims under the Statute of Elizabeth likewise remains. Accordingly, the Trustee's motion for summary judgment as to the first and fourth causes of action is also denied.

## CONCLUSION

For the reasons set forth herein, Defendants' motion for summary judgment as to all causes of action in Trustee's complaint is denied, and the Trustee's motion for summary judgment as to the first and fourth causes of action for constructive fraud under S.C. Code Ann. § 27-33-10 is also denied.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**04/07/2023**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 04/07/2023