**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number:  **20-03330-eg**
Adversary Proceeding Number:  **22-80008-eg**

# ORDER

The relief set forth on the following pages, for a total of 67 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**06/10/2024**



Elisabetta G. M. Gasparini
US Bankruptcy Judge
District of South Carolina

Entered: 06/10/2024

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Alan Keith Levesque,<br><br><div align="right">Debtor(s).</div> | C/A No. 20-03330-EG<br><br>Adv. Pro. No. 22-80008-EG<br><br>Chapter 7<br><br>**ORDER** |
| Michelle Vieira, Chapter 7 Trustee for Alan<br>Keith Levesque,<br><br><div align="right">Plaintiff(s),</div><br>v.<br><br>Think Tank Logistics, LLC<br>IGL Logistics, Inc.<br>James Burke,<br><br><div align="right">Defendant(s).</div> | |

**THIS MATTER** is before the Court for trial on the Complaint filed by Michelle Vieira, Chapter 7 Trustee (the "Trustee" or "Plaintiff") for Alan Keith Levesque.[1]  Defendants Think Tank Logistics, LLC ("TTL"), IGL Logistics, Inc. ("IGL"), and James Burke ("Burke") (collectively, "Defendants") filed an Answer.[2]  The dispute relates to redemption agreements entered in May of 2019 whereby Alan Keith Levesque ("Levesque" or "Debtor") transferred his minority ownership interests in TTL and IGL back to the respective companies and agreed to guarantee and indemnify Burke, the majority owner, for debts incurred by the companies prior to the transfer—all for $10.00.  The Trustee alleges the redemption agreements resulted in avoidable transfers under the Bankruptcy Code and state law and constitute a breach of Burke's fiduciary duty owed to Debtor as the minority member and shareholder of TTL and IGL.  The dispute is exacerbated by altogether conflicting expert reports regarding the going-forward prospects of the companies and the value

---

[1] ECF No. 1, filed Feb. 28, 2022.
[2] ECF No. 4, filed Mar. 31, 2022.

of the ownership interests transferred—Defendants' expert, John Markel ("Markel"), opining that

the companies had no value; and Plaintiff's expert, Christopher Nowell ("Nowell"), concluding

that the IGL's value at the time of the transfer was over $6 million.

Following a lengthy discovery period and motions practice, the Court conducted a three-

day trial.  The Trustee and her counsel; Burke, in his individual capacity and as representative of

TTL and IGL; Mystina Vogel ("Vogel"), as representative of IGL; and counsel for Defendants

were in attendance.  The Court admitted 80 exhibits into evidence and heard the testimony of

Levesque, Burke, Vogel, the Trustee, and the two experts.  The submission of Plaintiff's Exhibits

36-37, 63-65A, and Defendants' Appendix I were taken under advisement.  At the conclusion of

Plaintiff's evidence, Defendants orally moved for judgment on partial findings pursuant to Fed. R.

Civ. P. Rule 52(c), made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7052,

which the Court denied.  The parties agreed to brief their closing arguments and submitted them

on March 1, 2023.[3]

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The

parties contend that this proceeding contains non-core causes of action or core claims which this

Court does not have constitutional authority to finally adjudicate.  Nevertheless, the Court may

make final determinations in this matter because the parties have expressly consented to this

Court's entry of final orders and judgments.[4]  28 U.S.C. § 157(c); *see Wellness Int'l Network, Ltd.*

*v. Sharif*, 575 U.S. 665, 674 (2015).

After a thorough review of the record before it, applicable law, the documents introduced

into evidence, and the testimony of witnesses, including the excerpts of the deposition transcripts

presented for impeachment purposes, the Court admits Exhibits 36, 37, and Appendix I into

---

[33] ECF Nos. 81 and 82.
[4] Adversary Proceeding Report, ECF No. 7, filed Apr. 25, 2022.

evidence, excludes the reports of Plaintiff's expert, and holds that the Trustee is entitled to judgment in her favor on the claims seeking avoidance of Levesque's transfer of his 49% interest in IGL pursuant to (a) 11 U.S.C. § 544 and S.C. Code Ann. § 27-23-10 and (b) 11 U.S.C. § 548(a)(1)(B).  As to the 11 U.S.C. § 550 claim, the Court awards the Trustee the value of Levesque's ownership interest in IGL as of the time of the transfer, which the Court determines to be $13,558.97.  As to the remaining causes of action, the Court rules in favor of Defendants.  The Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, which is made applicable to this proceeding by Fed. R. Bankr. P. 7052.[5]

## FINDINGS OF FACT

### The Individual Parties and Businesses Involved in the Litigation

Levesque is the debtor in the underlying Chapter 7 bankruptcy case and a current employee of IGL and former 49% owner of IGL and TTL.  Burke is Levesque's former business partner, as the former 51% owner of IGL and TTL.  He currently is the 100% owner of IGL and TTL; as such, he is presently Levesque's supervisor.

TTL was a North Carolina limited liability company engaged in the business of logistics and supply chain management.  At the time of its organization on or about April 28, 2017, Burke, Levesque, and Adam Lawrence ("Lawrence") were TTL's members, each holding membership interests of 34%, 33%, and 33%, respectively.  Not long after TTL was organized, a dispute arose among its members, and Lawrence filed a lawsuit against Burke and Levesque.  TTL, in turn, filed a lawsuit against Lawrence.  The parties reached a resolution of both lawsuits on or about August 29, 2018.  Pursuant to the settlement, Lawrence agreed to surrender his interest in TTL in exchange

---

[5] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and vice versa.  As required pursuant to the Pretrial Scheduling Order entered on May 31, 2023 (ECF No. 51), the parties filed a Joint Pretrial Order which was entered on May 24, 2023 (ECF No. 54), stipulating to various facts which are included herein.

for $140,000.00, and the parties agreed to a mutual release of all claims.  As a result, Burke and Levesque held a 51% and 49% interest in TTL, respectively.  TTL's sole business was to operate as an agent of ICAT Logistics, Inc. ("ICAT").  Burke testified that ICAT had a "franchise-like" business model and controlled the software, billing, licenses, and all the tools needed for TTL to track and trace its customer shipments.

While the dispute with Lawrence was pending, on or about January 22, 2018, Burke and Levesque incorporated IGL, a carrier-based logistics company, in North Carolina.[6]  Burke testified that ICAT represented 75% of IGL's business.  At the time of its incorporation, Burke and Levesque were the sole shareholders of IGL, with Burke and Levesque holding 51% and 49% of the shares, respectively.  At startup, Burke contributed $6,000.00 to IGL, but Levesque did not make a capital contribution.  At all times relevant to this matter, Burke was the president and controlling majority shareholder of IGL,[7] and the majority member and manager of TTL.

### Events Occurring Prior to the Execution of the Redemption Agreements

In the beginning of 2019, IGL, as a start-up company, continued to have cash flow issues as Burke and Levesque worked to grow the business.  To maintain operations and pay its employees, IGL received a loan from Logistics Link, an unrelated company owned by Bill Pharris, which Burke managed, on January 24, 2019 in the amount of $40,000.00.[8]  IGL's financial wherewithal continued on shaky ground, as, on January 29, 2019, an employee of IGL, April Heffner ("Heffner"), was terminated due to suspected embezzlement of approximately $200,000.00.[9]  In January of 2019, Vogel was hired as an independent consultant to investigate

---

[6] The Articles of Incorporation were signed on January 22, 2018, but were subsequently filed in North Carolina on February 9, 2018.

[7] The By-Laws for IGL provide that a majority vote of the shares establishes a quorum for any vote of the shareholders, and the vote of a quorum shall be the act of the shareholders.

[8] Pl. Ex. 41.  Logistics Link had previously extended IGL a loan of $15,000.00 on or about June 14, 2018.

[9] As of the date of the trial, Heffner has been indicted for embezzlement but has not been convicted.  Burke also testified that IGL has ongoing civil litigation against Heffner.

the suspected embezzlement and review the financial records pertaining to TTL and IGL.[10] Subsequently, on April 8, 2019, ICAT terminated its contract with TTL and refused to pay its accounts receivable.

As a result of these events, TTL and IGL suffered economic hardships and a temporary downturn in revenue. Burke testified that IGL lost its truck drivers and was forced to return its two trucks to the leasing company, incurring termination fees and costs for repairs. He further testified that ICAT was attempting to lure TTL's employees and customers away and that IGL and TTL had lost access to their emails and ICAT's insurance, licenses, and software. While Burke and other members of IGL's sales team immediately began contacting former customers to recruit their business going forward, as Burke testified, there was great uncertainty whether customers would move their business to or remain with IGL because of other available, more stable options.

Burke and Levesque realized that a capital contribution would be necessary to keep the businesses afloat and allow them to obtain additional software, insurance, and licensing. Burke told Levesque they would both have to contribute capital to keep IGL and TTL going. Burke was willing to infuse cash into the businesses if he held 100% of their interest. Levesque believed his share of the necessary capital contribution for the combined companies would have been approximately $150,000.00; however, he did not have any capital to contribute and became concerned about becoming liable for the two companies' debts. Due to cash flow issues for both IGL and TTL, Levesque had not received any salary from January through April of 2019. He had, however, taken some member distributions during that time with Burke's approval, which Vogel testified totaled $24,500.00.[11] At some point in early 2019, Burke personally loaned Levesque

---

[10] Vogel was also working as a consultant for Logistics Link at that time. She testified that she had kept the books for Logistics Link since 2017.
[11] *See also* Pl. Ex. 24.

$10,000.00.  The lack of a steady income was causing Levesque financial as well as marital issues, and in early April of 2019, he approached Burke to ask if he could redeem his interest in the companies.  Around that time, Burke helped facilitate a position for Levesque at Logistics Link. On April 15, 2019, Levesque began working for Logistics Link.  On April 30, 2019, IGL received an additional $60,000.00 loan from Logistics Link.[12]  Burke testified that this loan was used to pay IGL employees.

## The Redemption Agreements

On or about May 31, 2019, TTL, Burke, and Levesque entered into a Membership Interest Redemption Agreement ("TTL Redemption Agreement")  and IGL, Burke, and Levesque entered into a similar Ownership Interest Redemption Agreement ("IGL Redemption Agreement", collectively, the "Redemption Agreements").[13]  The Redemption Agreements contain similar language and provided for, *inter alia,* the transfer of Levesque's membership and ownership interest in TTL and IGL, respectively, back to the companies.  As a result of this transfer, Burke obtained a 100% membership and ownership interest in TTL and IGL.

Levesque testified that the delay from early April, when he first approached Burke about redeeming his interest in TTL and IGL, until May 31, 2019, when he signed the Redemption Agreements, was a result of the attorney having to document the transaction.  Burke also testified that the delay was due to having to manage the issues arising from the ICAT contract cancellation. At the time the Redemption Agreements were executed, Levesque was indebted to Merritt Enterprises, LLC,[14] and other creditors, including the Internal Revenue Service,[15] Capital One

---

[12] Pl. Ex. 41; Def. Ex. L.
[13] Pl. Ex. 8 and 9.
[14] *See* Joint Pretrial Order, ¶33.  Pl. Ex. 74.
[15] Pl. Ex. 70.

Bank (USA), N.A.,[16] TD Bank, USA,[17] Conn Appliances,[18] CitiBank, N.A.,[19] American Express National Bank,[20] First-Citizens Bank & Trust Company,[21] and JD Receivables, LLC[22] (collectively, the "Additional 2019 Creditors").  Levesque testified that his debts exceeded his assets at that time.  The parties stipulated that TTL was the initial transferee of Levesque's membership interest in TTL and that IGL was the initial transferee of Levesque's shares in IGL.

The Redemption Agreements each provided "NOW THEREFORE in consideration of the premises and the mutual covenants and agreements herein contained, and *for other valuable consideration*, the receipt and legal sufficiency and adequacy of which are hereby acknowledged by the parties", TTL/IGL "agrees to pay Levesque the sum of $10.00, contemporaneously with the execution of this Agreement."[23]  As to the reference to "other valuable consideration", Levesque and Burke testified that the following additional consideration was provided in return for Levesque's interest in TTL and IGL: (1) the job at Logistics Link with increased salary;[24] (2) forgiveness of some credit card debt for Levesque's personal expenses on the TTL company credit card at the time of the transfer;[25] (3) forgiveness of Levesque's obligation to repay attorney's fees incurred during the litigation with Lawrence, which had been paid by TTL; (4) forgiveness of the personal loan from Burke for $10,000.00; and (5) forgiveness of Levesque's obligation to "true

---

[16] Pl. Exs. 71, 72 and 73.
[17] Pl. Ex. 76.
[18] Pl. Ex. 80.
[19] Pl. Ex. 81.
[20] Pl. Ex. 83.
[21] Pl. Ex. 85.
[22] Pl. Ex. 87.
[23] Pl. Exs. 8 & 9 (emphasis added).
[24] During his deposition, however, Levesque did not mention that the job was in return for the transfer of the shares. Pl. Ex. 90.
[25] Pl. Ex. 42.  Vogel testified that the amount of credit card debt forgiven as part of the Redemption Agreement was $372.13.  In the Defendants' Responses to Plaintiff's Interrogatories, Defendants stated that the $372.13 was identified as personal expenses *after* the redemption agreement had been agreed to.  Pl. Ex. 89.

up" the capital accounts as a result of him taking distributions from IGL in an amount greater than he was entitled to receive.

The Redemption Agreements also included provisions requiring Levesque to indemnify Burke for any amounts Burke paid for the debts of TTL and IGL up to the time of the transfer. They provide, in pertinent part:

> Burke and Levesque agree that they shall each be responsible for fifty percent (50%) of [TTL/IGL's] debts, expenses and other obligations incurred prior to the date of this Agreement in the event that [TTL/IGL] is not able to satisfy those obligations in full. . . . The loans made by Burke and Logistics Link, LLC for the payment of [TTL/IGL's] debts and expenses incurred prior to the date hereof shall be referred to herein as the ["Think Tank Loans"/ "IGL Loans"].  In the event that (a) [TTL/IGL] ceases operations or (b) Burke and/or Logistics Link, LLC write off the outstanding balance of the [TTL/IGL] Loans as bad debts, then Levesque agrees to indemnify, reimburse and pay Burke an amount equal to fifty (50%) of the unpaid balances on the [TTL/IGL] Loans within ten (10) days of written demand by Burke.  Further, in the event that Burke personally pays any [TTL/IGL] debt or obligation pursuant to a personal guaranty which Burke executed prior to the date hereof, Levesque agrees to indemnify, pay reimburse Burke an amount equal to fifty percent (50%) of the total payments made by Burke pursuant to any such personal guaranties within ten (10) days of written demand by Burke.

Levesque understood that by entering into the Redemption Agreements he was agreeing to cover half of the businesses' debts up to the time of the transfer.  Levesque testified that when he entered into the Redemption Agreements, the companies' prospects were not promising because of the termination of the ICAT's contract, which comprised all of TTL's business and 75% of IGL's business, and because of the loss of their business software and licensing that ICAT had provided.  He further testified that at that time, there was a lot of fear and uncertainty as to IGL's ability to continue in business and he believed TTL was essentially out of business.  Accordingly, Levesque believed the value of TTL and IGL at the time of the transfers was $0.00.

**Events Occurring Subsequent to the Execution of the Redemption Agreements**

Soon after the transfers, TTL was consolidated with IGL.  The Court takes judicial notice that the records of the North Carolina Secretary of State's Office reflect that TTL is currently administratively dissolved.[26]  Despite telling Levesque that capital contributions were necessary to keep IGL operating, Burke did not personally contribute capital to IGL at any point in 2019.  Towards the end of 2019, Burke took draws to "even up" the distributions that Levesque had taken during the year.  Vogel testified that following Levesque's transfer of his interest in the companies, existing employees of TTL continued to provide services for IGL and were paid using TTL's payroll, insurance, and retirement programs, which were funded through loans from Logistics Link.  On July 26, 2019, Logistics Link loaned IGL an additional $49,000.00.[27]  On December 31, 2019, IGL reported the loss from Heffner's alleged embezzlement on its financial statements as "Allowance – Bad Debt and Fraud" of $216,874.31.[28]  Burke testified that, over time, IGL was able to recapture a significant number of former ICAT customers through his prior connections and business relationships with them.

IGL's predicament then took a positive turn.  In 2020, Logistics Link merged with IGL, and all its operations and employees were absorbed into IGL.  Vogel testified that due to the merger, IGL's revenues increased by approximately $5 million.  The 2020 global pandemic also positively affected IGL's business and substantially increased its revenues, as IGL capitalized on the increased need for warehouse space as companies who had previously preferred "just in time" deliveries of their goods became interested in stockpiling inventory to avoid supply chain

---

[26] Vogel also stated in an email to Trustee's counsel on February 17, 2021, that "Think Tank is a dissolved entity." Pl. Ex. 18.

[27] Def. Ex. L.

[28] Pl. Ex. 22, at IGL 000153; *see also* Pl. Ex. 37, at 3.  This is reflected in the Profit & Loss statement that was printed on June 14, 2021.

interruptions.  IGL's business rapidly expanded as it acquired warehouse spaces to offer its customers in South Carolina as well as in Phoenix, Arizona.  In 2021, IGL's business expanded further when two other businesses, Epps Logistics and Greenway Logistics, merged into IGL, increasing its international revenues and number of employees.

### Levesque's Bankruptcy Case

On August 21, 2020 ("Petition Date")—approximately fifteen months after executing the Redemption Agreements —Levesque filed for relief under Chapter 7 of the Bankruptcy Code, C/A No. 20-03330-eg ("Bankruptcy Case").[29]  His Schedules list assets of $345,325.18, secured debts in the amount $572,231.00, unsecured debts totaling $425,980.00, and priority unsecured claims of $35,000.00.[30]  As of the Petition Date, Levesque's assets were insufficient to pay his creditors. Levesque received a discharge on November 24, 2020.[31]

At trial, the Trustee testified that multiple claims were filed, each reflecting an allowable claim in Levesque's Bankruptcy Case.[32]  According to the claims register maintained with the Court, claims totaling $459,207.24 in debt were filed, the majority being secured.  The Internal Revenue Service filed a priority unsecured claim in the approximate amount of $35,000.00. During the bankruptcy, the Trustee sold Levesque's personal residence, yielding $78,816.74 for the estate after payment of secured lienholders, costs of sale, and Levesque's homestead exemption.[33]  Over $100,000 is owed to unsecured creditors.[34]  Aside from this adversary

---

[29] Pl. Ex. 1.

[30] Pl. Ex. 2; Case No. 20-03330, ECF No. 1; as subsequently amended on October 9, 2020 (ECF No. 25).

[31] Case No. 20-03330, ECF No. 33.

[32] Pl. Exs. 66-67; 69-74; 76-87.

[33] Report of Sale, Case No. 20-03330-EG, ECF No. 58. The Report of Sale reflects that the property at 3561 Henrietta Hartford Road, Mt. Pleasant, SC 29466, was sold for $850,283.46.  Roundpoint Mortgage and Synovus Bank were paid the value of their liens on the property in the amounts of $377,375.99 and $141,186.29, respectively.

[34] According to the Claims Register in Case No. 20-03330-EG, the total of unsecured non-priority claims filed was $104,103.71.  A claim filed by First-Citizens Bank & Trust Company in the amount of $168,016.47 was filed as secured but appears to be a guaranty on a mortgage secured by property owned by Levesque's former spouse.  There is no indication that the guaranty has been called.  Another claim filed by SouthStar Financial LLC for $17,565.37

proceeding, the Trustee was unable to identify any other assets that could be sold to pay the debts in this case.  As of the Petition Date, Merritt Enterprises, LLC and the Additional 2019 Creditors continued to hold allowable unsecured claims against Levesque.

### Financial Records of TTL and IGL

Vogel testified regarding the financial records of TTL and IGL, including the companies' Profit & Loss Statements and Balance Sheets.  She was responsible for producing the financial documents that the Trustee requested in discovery.[35]  The financial statements produced covered the same periods but were printed and turned over to the Trustee on different dates throughout the proceedings, depending on the time of the request—one set of financial statements was printed out on June 14, 2021, another set bore the date of August 29, 2022, and other Profit & Loss Statements or Balance Sheets were printed either before or after those dates.  Some of the figures in the financial statements changed depending on the print date because the financial records were produced through the QuickBooks software program and reflected what information had been entered into the program as of the time they were printed.

Vogel testified that financial data was input into the QuickBooks program in the ordinary course of business but not always at or near the time the event occurred.  For several months after Heffner was fired, no employee was assigned to enter financial data into the system.  During that time, some of the data was transferred automatically from the banks and credit card companies from a live feed that was turned on in the QuickBooks program.  Vogel explained that when data

---

was filed as secured but appears to be a guaranty from Levesque for a debt owed by Anyware LLC, which is secured by all assets, including accounts receivable of Levesque and Anyware LLC.  Thus, it appears that the total unsecured claims would range from approximately $105,000 to $290,000.00, depending on whether the guaranties are included.  Given the extensive motion practice and lengthy trial in this case, the Court suspects that administrative claims incurred in connection with the prosecution of this adversary proceeding may exceed the unsecured claims entitled to payment in this case.

[35] Pl. Ex. 18.  Email from Vogel to Plaintiff's Counsel dated Feb. 17, 2021, which references attached Profit & Loss reports for 2018 (inception), 2019, and 2020 related to IGL.

regarding a particular transaction is transferred into QuickBooks through the live feed, QuickBooks guesses how to classify the transaction. Accordingly, it would be ordinary procedure for an actual person to go back and correct those records if the transactions were misclassified. When data was subsequently entered into QuickBooks, it was done using bank statements that were generated at or near the time of the transactions. Vogel testified that the Profit and Loss Reports printed on June 14, 2021, which the Trustee's expert primarily relied upon, were not fully reflective of the entire financial picture of IGL as of the time period reported because they were not closed and complete.

In 2021, IGL recorded in its books a "Theft of Assets" in the amount of $196,359.80 for the Heffner embezzlement as of December of 2019 as well as a "Bad Debt Expense" in the amount of $33,890.00, unrelated to the embezzlement but representing receivables that customers had refused to pay.[36] At some point between November 15, 2021 and August 17, 2022, IGL updated their books to reflect that this bad debt expense was on the books as of May 31, 2019 rather than December 31, 2019, which was reflected in a revised January through May 2019 Profit & Loss Statement. During the same time period, the "Assets" portion of IGL's Balance Sheet was updated to reduce accounts receivable from $335,763.80 to $203,693.90 and to include a further reduction of $98,179.90 for "Allowance for Doubtful Accounts,"[37] thus reducing the total amount of assets on the Balance Sheet as of May 31, 2019, from $367,927.12 to $121,053.08. The delay in updating the 2019 Profit & Loss Statements was due to the time required for Vogel to investigate and uncover the extent of the embezzlement. Heffner had allegedly intercepted checks made out to IGL and deposited them into a bank account she opened for a business with a similar name. In

---

[36] Def. Ex. K. The total of the "Asset Loss Expense" was $230,249.80. The information was reflected in IGL's Profit & Loss Statement for May 2019, which was printed on August 17, 2022.
[37] Pl. Ex. 27.

addition, Vogel discovered that Heffner had allegedly exploited IGL resources by using IGL's trucks, equipment, and personnel to conduct business that was not otherwise accounted for in IGL's records. Vogel testified that the "Allowance for Doubtful Accounts" in the amount of $98,179.90 was included to account for those losses.

The various IGL's Profit & Loss Statements presented into evidence are summarized as follows:[38]

| Reporting Period | Date of Document | Gross Sales | Gross Profit | Total Expenses | Net Income |
|---|---|---|---|---|---|
| Jan. – Dec. 2018 | 02/17/2021[39] | $363,218.96 | $149,903.45 | $109,351.83 | $40,551.62 |
| *Jan. – Dec. 2018* | *06/14/2021[40]* | *$363,218.96* | *$149,903.45* | *$109,351.83* | *$40,551.62* |
| Jan. – May 2019 | 11/15/2021[41] | $533,945.98 | $151,919.13 | $162,656.87 | ($10,737.74) |
| *Jan. – May 2019* | *08/17/2022[42]* | *$533,945.98* | $151,919.13 | *$406,107.70\** | *($254,188.57)* |

*\*Includes "Theft of Assets" of $196,359.80 and "Bad Debt Expense" of $33,890.00*

| | | | | | |
|---|---|---|---|---|---|
| Jan. – Dec. 2019 | 02/17/2021[43] | $2,619,207.67 | $846,986.06 | $691,645.86 | $151,864.03[45] |
| *Jan. – Dec. 2019* | *06/14/2021[44]* | *$2,612,165.08* | $809,034.05 | *$840,154.33\*\** | *($31,120.28)* |

*\*\* Includes "Allowance – Bad Debt and Fraud" of $216,874.31*

| | | | | | |
|---|---|---|---|---|---|
| Jan.-Aug.21, 2020 | 10/25/2022[46] | $3,521,879.87 | $1,298,278.57 | $686,406.15 | $611,872.42 |
| Jan. – Dec. 2020 | 02/17/2021[47] | $5,600,777.35 | $2,450,301.54 | $1,463,967.87 | $986,333.67 |
| *Jan. – Dec. 2020* | *06/14/2021[48]* | *$5,600,777.34* | *$2,452,592.82* | *$1,472,185.86* | *$980,986.86[49]* |
| Jan. – Mar. 2021 | 06/14/2021[50] | $1,802,028.20 | $828,262.14 | $539,876.94 | $138,385.21[51] |

---

[38] Pl. Ex. 37. The monthly Profit & Loss data was also summarized in Pl. Ex. 37 and contained in detail at Pl. Exs. 22 and 28.
[39] Pl. Ex. 19.
[40] Pl. Ex. 22 (IGL_000126).
[41] Pl. Ex. 25.
[42] Pl. Ex. 26.
[43] Pl. Ex. 20.
[44] Pl. Ex. 22 (IGL_000139).
[45] Net Ordinary Income for this period was $155,340.20.
[46] Pl. Ex. 35.
[47] Pl. Ex. 21.
[48] Pl. Ex. 22 (IGL_000155-56).
[49] Net Ordinary Income for this period was $980,406.96.
[50] Pl. Ex. 22 (IGL_000181-82).
[51] Net Ordinary Income for this period was $288,385.20.

| | | | | | |
|---|---|---|---|---|---|
| Jan. – Dec. 2021 | 10/05/2022[52] | $15,188,442.36 | $5,295,754.24 | $3,214,830.10 | $2,147,045.15[54] |
| *Jan. – Dec. 2021* | *10/25/2022[53]* | *$15,184,657.13* | $5,298,061.83 | *$3,625,029.13* | *$1,739,153.71[55]* |

The various IGL Balance Sheets presented into evidence are summarized as follows:[56]

| **Reporting Period** | **Date of Document** | **Assets** | **Liabilities** | **Equity** |
|---|---|---|---|---|
| As of Dec. 31, 2018 | 06/14/21[57] | $103,283.27 | $71,231.65 | $32,051.62 |
| As of May 31, 2019 | 11/15/21[58] | $367,927.12 | $363,113.24 | $4,813.88 |
| *As of May 31, 2019* | *08/17/22[59]* | *$121,053.08** | *$364,778.24* | *($243,725.16)* |

*\*A/R was reduced from $335,763.80 to $203,693.90, plus*
*further reduction of $98,179.90 for "Allowance for Doubtful Accounts"*

| | | | | |
|---|---|---|---|---|
| As of Aug. 21, 2020 | 10/25/2022[60] | $1,312,299.30 | $747,995.27 | $564,304.03 |
| As of Dec. 31, 2021 | 10/05/2022[61] | $2,407,674.28 | $280,914.82 | $2,407,674.28 |
| *As of Dec. 31, 2021* | *10/26/2022[62]* | *$2,692,750.14* | *$274,663.12* | *$2,418,087.02* |

The IGL Tax Returns presented into evidence are summarized as follows:

| Reporting Period | Date of Document | Gross Sales | Gross Profit | Taxable Income | Total Assets |
|---|---|---|---|---|---|
| 2018 | 09/09/2019[63] | $607,898 | $184,381 | $48,188 | $48,033 |
| *Amended 2018* | *06/02/2022[64]* | *$362,904* | *$125,751* | *$40,852* | *$117,784* |
| 2019 | unknown[65] | $2,795,150 | $992,573 | $161,304 | $574,614 |
| *Amended 2019* | *06/17/2022[66]* | *$2,578,275* | *$576,683* | *($19,438)** | *$418,072[67]* |

*\*Reflects Income Loss of $196,360 for Theft of Cash*

---

[52] Pl. Ex. 33.

[53] Pl. Ex. 34.

[54] Net Ordinary Income for this period was $2,080,924.14.

[55] Net Ordinary Income for this period was $1,673,032.70.

[56] IGL's monthly Balance Sheets were produced as part of Pl. Ex. 23.

[57] Pl. Ex. 23 (IGL_000084)

[58] Pl. Ex. 24; Balance Sheet dated 06/14/21, at Pl. Ex. 23 (IGL_000089), has identical data.

[59] Pl. Ex. 27; Balance Sheet dated 08/30/22, at Pl. Ex. 29, has identical data but shows fewer details.

[60] Pl. Ex. 32

[61] Pl. Ex. 30

[62] Pl. Ex. 31

[63] Pl. Ex. 56

[64] Pl. Ex. 57

[65] Pl. Ex. 58

[66] Pl. Ex. 59

[67] IGL's assets consisted of accounts receivables.

| 2020 | 12/29/2021[68] | $5,601,065 | $2,452,880 | $959,161 | $1,617,665 |
| 2021 | 10/14/2022[69] | $15,184,657 | $5,298,062 | $1,789,428 | $2,321,109 |

## CONCLUSIONS OF LAW

The Complaint alleges eight causes of actions against the Defendants:  (1) Avoidance of the TTL Redemption Agreement pursuant to 11 U.S.C. § 544[70] and S.C. Code Ann. § 27-23-10; (2) Avoidance of the TTL Redemption Agreement pursuant to § 548(a)(1)(B); (3) Avoidance of the TTL Redemption Agreement pursuant to § 544 and N.C. Uniform Voidable Transactions Act; (4) Avoidance of the IGL Redemption Agreement pursuant to § 544 and S.C. Code Ann. § 27-23-10; (5) Avoidance of the IGL Redemption Agreement pursuant to § 548(a)(1)(B); (6) Avoidance of the IGL Redemption Agreement pursuant to § 544 and N.C. Uniform Voidable Transactions Act; (7) Recovery of the Avoided Transfers pursuant to § 550; and (8) Breach of Fiduciary Duty (as to Defendant Burke).  The parties filed cross motions for summary judgment on January 3, 2023 and January 30, 2023,[71] which were denied by order entered April 7, 2023.[72]  In the Joint Pretrial Order, the parties stipulated that South Carolina law is the proper choice of law for the state fraudulent transfer causes of action and North Carolina law applies to the breach of fiduciary duty cause of action.[73]  Accordingly, the Trustee is no longer pursuing the North Carolina fraudulent transfer causes of action (i.e., the third and sixth causes of action).

For the reasons set forth below, the Court does not admit the Trustee's expert testimony as to the value of IGL as of the date of the transfers.  Moreover, the Trustee has failed to introduce

---

[68] Pl. Ex. 60

[69] Pl. Ex. 61

[70] Further references to the U.S. Bankruptcy Code (11 U.S.C. § 101 et seq.) shall be by section number only.

[71] ECF No. 28 (Defendants' Motion for Summary Judgment); ECF No. 30 (Trustee's Motion for Summary Judgment).

[72] ECF No. 45.

[73] ECF No. 54, filed May 24, 2023.

any evidence to prove that that the TTL Redemption Agreement was voluntary.  As to IGL, based on the evidence presented, even if the company was completely worthless when the transfer of interest was executed, the Court finds that Leveque's assumption of liabilities as part of the IGL Redemption Agreement resulted in him taking on liabilities in excess of the value he received, thus satisfying the requirements for a constructively fraudulent transfer.  Accordingly, the Court finds in favor of the Trustee as to the fourth, fifth, and seventh causes of action and concludes that the Trustee may avoid Levesque's transfer of his ownership interest in IGL to Defendants because it was made without valuable consideration.  The Court finds in favor of Defendants as to the first, second, and eighth causes of action.

Before delving into the analysis of each claim, it is necessary to first address the evidentiary issues taken under advisement, including the admissibility of the Trustee's expert testimony and reports and whether the parol evidence rule bars the evidence of additional consideration that the Defendants presented.  The Court has gone to great lengths to fully review and consider the financial documents presented and to consider the evidentiary issues relating to the experts' reports.  While such thorough review ultimately may not be crucial to the Court's determination of the Trustee's claims based on the fraudulent conveyance (because even if IGL was valued at $0.00, Levesque's assumption of the debt resulted in the Court's concluding the transaction was voluntary and for nominal consideration), the analysis is necessary for purposes of determining the value of the avoided transfer of Levesque's interest in IGL for the Trustee's recovery under § 550; therefore, the Court's consideration of these issues is detailed below.

## I. **Evidentiary Issues**

### a. *Admission of Exhibits into Evidence*

#### i. Financial Statements of IGL

Defendants objected to the introduction of the financial statements of IGL (Plaintiff's Exhibits 18 through 25 and 30 through 35)[74] on grounds of hearsay as well as lack of foundation and relevancy. These documents are financial records that Defendants produced in discovery bearing the print dates of February 17, 2021, June 14, 2021, November 15, 2021, October 5, 2022, October 25, 2022, and October 26, 2022. These financial statements were printed prior to their amendment to incorporate the losses incurred as a result of Heffner's alleged embezzlement. Prior to trial, the Court issued an order denying Defendants' motion to exclude this evidence and reserving its ruling until trial, when testimony regarding the trustworthiness of such records could be presented.[75] Plaintiff asserts that these documents are records of regularly conducted activity under Fed. R. Evid. 803(6) and are evidence of the status of the business records as of the date they were created under Fed. R. Evid. 807; as such, Plaintiff asserts they are an exception to hearsay.

Fed. R. Evid. 803(6) provides that records of a regularly conducted activity are an exception to hearsay if:

> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified

---

[74] Exhibit 18 is an email dated February 17, 2021 from Vogel to Trustee's counsel attaching Profit & Loss Statements for 2018, 2019, and 2020 (Exs. 19, 20, and 21). Defendants did not object to Exhibits 26-29, which were relied upon by their expert, Markel. *See* Defendants' Motion to Exclude Evidence, ECF No. 58 at Ex. 1, filed June 6, 2023. At trial, the Trustee appeared to indicate an objection to these exhibits pursuant to Fed. R. Evid. 803(6)(E) if they were being introduced for the truth of the matter asserted. *See also* Joint Pretrial Order, ECF No. 54.
[75] ECF No. 63, filed Aug. 18, 2023.

witness . . . ; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Defendants argue that these financial records should be excluded because the documents are untrustworthy as they were prepared using financial data entered by Heffner or impacted by her alleged embezzlement. Finding that Plaintiff had satisfied the requirements of Fed. R. Evid. 803(6)(A) through (D), the Court admitted Plaintiff's Exhibits 18 through 25 and 30 through 35 into evidence, subject to the Court's determination of trustworthiness after a review of all the documents presented.[76]

"If the proponent has established the stated requirements of the exception—regular business with regularly kept record, source with personal knowledge, record made timely, and foundation testimony or certification—then the burden is on the opponent to show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6)(E) advisory committee note to 2014 amendment (explaining that "[i]t is appropriate to impose this burden on the opponent, as the basic admissibility requirements are sufficient to establish a presumption that the record is reliable"); *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 204-05 (4th Cir. 2000) ("Reports and documents prepared in the ordinary course of business are generally presumed to be reliable and trustworthy . . . ."). Defendants carry the burden of proof of demonstrating that the documents are untrustworthy.

"A determination of untrustworthiness necessarily depends on the circumstances." Fed. R. Evid. 803 advisory committee note to 2014 amendment. "The opponent, in meeting its burden, is not necessarily required to introduce affirmative evidence of untrustworthiness." *Id*. "The principal precondition to the admission of documents under the business records exception is that

---

[76] The Court also noted that the financial documents appeared not to be hearsay pursuant to Fed. R. Evid. 801(d)(2) as statements of an opposing party because the Defendants had prepared them and Plaintiff was offering them into evidence.

the records 'have a sufficient indicia of trustworthiness to be considered reliable . . . [and] [t]he determination of whether, in all the circumstances, the records are sufficiently reliable to warrant their admission in evidence is left to the sound discretion of the trial court.'" *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 592 B.R. 513, 528 (Bankr. S.D.N.Y. 2018), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec., LLC*, 605 B.R. 570 (S.D.N.Y. 2019), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 830 F. App'x 669 (2d Cir. 2020) (quoting *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632-33 (2d Cir. 1994)) (internal quotation marks and citation omitted).

Objections to the accuracy of records or to the extent of the preparer's personal knowledge do not affect the admissibility of the records and are instead directed to the weight of the evidence. *See U.S. v. Wein*, 521 Fed. Appx. 138, 140 (4th Cir. 2013) (concluding that an argument regarding the accuracy or completeness of the records does not affect admissibility and is directed to the weight of the evidence); *Am. Int'l Pictures, Inc. v. Price Enters., Inc.*, 636 F.2d 933, 935 (4th Cir. 1980) (rejecting claim that business record lacked trustworthiness because objection was directed to weight of evidence, not admissibility); *U.S. v. Ellenbogen*, 365 F.2d 982, 988 (2d Cir. 1966) ("It is the appellant's contention that, because the records contained these falsifications, the entire exhibit should have been excluded . . . . Under the circumstances the general principle should be applied that regularly kept business records should be admitted and evidence of matters affecting their credibility should go only to their weight. The fact that certain transactions recorded were tainted with fraud does not render the records inadmissible.").

The testimony indicates that Heffner was either responsible for or provided the financial data for input into the QuickBooks software program for the purpose of preparing financial records of the company. For a period of several months after Heffner's termination, no employee was

assigned to input the data into QuickBooks and some of the data was being transferred and categorized automatically from the banks and credit card companies from a "live feed." Plaintiff's Exhibits 18 through 25 and 30 through 35 include Profit and Loss Statements and Balance Sheets which Vogel testified reflect the data that had been entered into the QuickBooks program as of the print date shown on the documents, which may have been incomplete or not fully accurate.

As to the financial statements that Defendants did not object to and that they rely on for the most part—Exhibits 26 through 29[77]—the Trustee raised some concerns as to the reliability or trustworthiness of these financial records, which include the IGL Profit & Loss Statement (January through May 2019), IGL Balance Sheet (as of May 31, 2019) (Detailed Version), IGL Monthly Profit & Loss Statements from February of 2018 through May of 2019, and IGL Balance Sheet (as of May 31, 2019), given that they were printed and produced in August of 2022—after the commencement of this litigation. The Trustee sought admission of these exhibits for non-hearsay purposes and sought to exclude these exhibits to the extent Defendants sought to admit them for the truth of the matter asserted. These financial statements were amended after discovery between the parties had commenced to account for certain losses that IGL had sustained. As Vogel explained, the financial statements were amended to record the asset loss expense during the applicable period as a result of Heffner's alleged embezzlement and to account for other related bad debt losses. Defendants argue that these amended financial statements present a more accurate picture of the company's financial situation up to the date of the entry into the Redemption Agreements. "Courts typically only find that a report lacks reliability where it 'is prepared in the anticipation of litigation because the document is not for the systematic conduct and operations of

---

[77] See Def. Ex. J (IGL Balance Sheet as of May 31, 2019) (also identified as Pl. Ex. 27); Def. Ex. K (IGL Profit & Loss as of May 31, 2019) (also identified as Pl. Ex. 26); and Def. Ex. O (February 2018 to May 2019 Monthly Profit & Loss Statements) (also identified as Pl. Ex. 28).

the enterprise but for the primary purpose of litigating.'"  *United Prop. & Cas. Ins. v. Couture*, 639 F. Supp. 3d 590 (D.S.C. 2022) (quoting *Sinkovich*, 232 F.3d at 205).  The mere fact a business record was prepared in anticipation of litigation, however, does not automatically disqualify it for exception from the hearsay rule, as this is just one circumstance to consider when determining trustworthiness.  *See Smith v. Beck,* No. 1:08CV166, 2011 WL 65962, at*4 (M.D.N.C. Jan. 10, 2011) (finding that though the report may have been prepared in anticipation of litigation, the internal investigation was conducted as part of routine activity and responsibilities of the preparer and was therefore admissible).

Given the events of 2019, the ramifications of the alleged embezzlement and the changes IGL underwent following the execution of the Redemption Agreements, IGL's financial records for that year are predictably flawed.  If the pre-litigation financial records are used, they do not provide a complete picture of what transpired and what losses were sustained during the period accounted for.  On the other hand, the amended financial statements prepared after the adversary proceeding was commenced appear to account for all the losses in May of 2019—the month the Redemption Agreements were entered into—when the losses technically occurred over time prior to and immediately following Heffner's termination in January of 2019.  Accordingly, the Court is presented with financial records which are admissible and have sufficient indicia of trustworthiness but are not completely accurate.  Said differently, each set of financial statements have their own flaws and bear at least some indicia of untrustworthiness.  Thus, the evidence indicates that they all have some indicia of untrustworthiness.  Nevertheless, the Court will allow the admission of Plaintiff's Exhibits 18 through 35 and will give these exhibits the appropriate weight considering the concerns raised by both the Trustee and the Defendants.

ii.    Compilations of TTL & IGL Financial Documents

Plaintiff's Exhibit 36 and 37 were taken under advisement.  Exhibit 36 is a summary of

exhibits 54 and 55, which are 2017 and 2018 tax returns for TTL that Defendants produced in

discovery.  Exhibit 37 is a summary of the financial information contained in 19-35 and 56-61,

which are the Profit and Loss Statements, Balance Sheets, and 2018-2021 tax returns for IGL for

various time periods reflected on each document.  The Federal Rules of Evidence allow for the

admission of summaries to prove the content of voluminous documents so long as the underlying

documents are admissible.  Fed. R. Evid. 1006.  Because the Court has admitted the underlying

documents, the compilations are likewise admitted and given the appropriate weight.

**b.  *Admissibility of Expert Witness Testimony and Reports***

Prior to trial, the parties both filed motions *in limine* seeking to exclude their opponent's

expert reports and testimony.  By order entered August 18, 2023 (the "Motions *in Limine* Order"),

the Court concluded that both Nowell and Markel were qualified as expert witnesses by their

knowledge, skill, experience, training and/or education.[78]  With some exceptions,[79] the Court

declined to exclude the expert's testimony and reports prior to trial.  At the beginning of the trial

and prior to opening statements, the Court noted the recent amendment to Federal Rule of Evidence

702,[80] which took effect after the Motions *in Limine* Order was entered, and clarified that it did

---

[78] ECF No. 62.

[79] Markel's opinion and testimony regarding the valuation of TTL and consideration for the transfers (¶ 8 of Markel's Report and Appendix D) were excluded.  The Court also excluded Markel's opinion and testimony regarding the value of and consideration for the apportioned value of Levesque's guarantee of TTL's company debts.  Appendix E of Markel's Report, which provides a valuation of Levesque's debt guarantee, was not offered into evidence.

[80] Effective December 1, 2023, Fed. R. Evid. 702 was amended to provide:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise *if the proponent demonstrates to the court that it is more likely than not that*:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and

not intend for its prior order to be construed as allowing the expert testimony and reports into evidence before hearing their testimony—only that they were *not excluded* from evidence prior to trial.  The advisory committee's notes to these amendments indicate that questions regarding the sufficiency of an expert's basis and the application of the expert's methodology are questions of admissibility and not questions of weight.[81]  In a jury trial, this rule serves to protect juries from being swayed by dubious expert testimony.  *See Anderson v. Cordell L.L.C. (In re Infinity Bus. Grp.),* C/A No. 10-06335, Adv. No. 12-80208, 2018 WL 1234649, at *2 (Bankr. D.S.C. Feb. 8, 2018).  The same concerns are not present where the judge is sitting as the trier of fact and can weigh the probative value of an expert's testimony.  *Id.*  "A court sitting as a trier of fact frequently will allow the testimony to be heard, then will disregard that evidence which is inadmissible or unpersuasive."  *Id.* (quoting *Berry v. Sch. Dist. of City of Benton Harbor*, 195 F. Supp. 2d 971, 977 n.3 (W.D. Mich. 2002).

Counsel for both parties acknowledged their understanding of the prior ruling that their respective experts had been determined to be qualified, but they still needed to demonstrate the admissibility of their reports and testimony at trial.  Accordingly, the Court allowed the parties to present the testimony of their respective experts and their expert reports and provided them with an opportunity to demonstrate that such evidence is admissible.  The Court admitted Markel's

---

(d) *the expert's opinion reflects a reliable application of* the principles and methods to the facts of the case.
(Emphasis added to note the amendments to the rule).

[81] The advisory committee's notes for the 2023 Amendments provide:

[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule. *See* Rule 104(a). This is the preponderance of the evidence standard that applies to most of the admissibility requirements set forth in the evidence rules. . . . But many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).

(Citations omitted).

testimony and reports, finding that it complied with Rule 702, but took the admission of Nowell's reports under advisement.

Under Rule 702, the testimony of an expert witness must, among other things, be "based on sufficient facts or data," and must be "the product of reliable principles and methods." Fed. R. Evid. 702(a)-(c). The expert's opinion must also reflect "a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(d) "Rule 702 thus 'imposes a special gatekeeping obligation on the trial judge' to 'ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (citing cases and quoting *Nease v. Ford Motor Co.*, 848 F.3d 219, 229-30 (4th Cir. 2017) (internal quotation marks and citation omitted)). The proponent of the expert testimony bears the burden of demonstrating by a preponderance of the evidence that the testimony is admissible. *In re Nellson Nutraceutical, Inc.,* 356 B.R. 364, 372 (Bankr. D. Del. 2006) (citing *Daubert v. Merrell Dow Pharms.,* 509 U.S. 579, 592 n.10 (1993)). "The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." *Campbell v. Hanckel (In re Hanckel),* C/A No. 12-04936, Adv. Pro. No. 14-80016, 2015 WL 8607388, at *15 (Bankr. D.S.C. Dec. 11, 2015) (quoting *In re TMI Litig.*, 193 F.3d 613, 665 (3d Cir. 1999), *amended by* 199 F.3d 158 (2000)). In *Daubert,* the Supreme Court provided four, non-exhaustive factors to consider when determining reliability of an expert's opinion: (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" inherent in the expert's theory or technique; and (4) whether the expert's methodology is generally accepted in his field of

expertise. *Nease* 848 F.3d at 229 (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593-94 (1993)); *see also Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 148 (1999) (extending *Daubert* standard to non-scientific testimony).

Expert testimony must also be relevant to be admissible. *Daubert,* 509 U.S. at 597. Under Federal Rule of Evidence 702, an expert opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Anderson v. Cordell (In re Infinity Bus. Grp., Inc.),* C/A No. 10-06335, Adv. Pro. No. 12-80208, 2018 WL 1234649, at *1-2 (Bankr. D.S.C. Feb. 8, 2018). "If the factual basis of an expert's opinion is so fundamentally unsupported because the expert fully relies on altered facts and speculation, or fails to consider relevant facts in reaching a conclusion, the expert's opinion can offer no assistance to the trier of fact and is inadmissible on relevance grounds." *In re Nellson Nutraceutical, Inc.,* 356 B.R. at 373.

i.   Nowell's Reports and Testimony

The Trustee engaged Nowell, a licensed certified public accountant, to perform a valuation of IGL as of May 31, 2019 (the date of the Redemption Agreements), August 21, 2020 (the Petition Date), and December 31, 2021. The Trustee specifically engaged Nowell to do a valuation of IGL as a going concern business. He did not conduct any valuation of TTL.

1.   *Valuation of IGL as of May 31, 2019*

Nowell conducted his valuation analysis in 2022 and prepared an initial report dated November 8, 2022, which stated that IGL had a value of $6,999,500.00 as of May 31, 2019.[82] He then amended his report on October 31, 2023 (the "Amended Report") to correct a clerical error identified during his deposition and a math error that did not materially affect his determination of

---

[82] Pl. Ex. 63.

value,[83] but his overall conclusion as to IGL's value remained unaltered.  The Amended Report indicates that the standard of value employed was "fair market value" and the premise of value was "value as a going concern."

To determine the value of IGL, Nowell reviewed and examined the financial statements of the company, its tax returns, the deposition of Levesque, Burke's Rule 2004 Examination, the IGL Redemption Agreement, the Articles of Incorporation for IGL, and ICAT's Agency Agreement.[84]  Nowell testified that he was provided with three versions of financial statements for IGL:  One version generated June 14, 2021,[85] an amended version generated August 17, 2022, and another version generated August 30 2022.[86]  Using his professional judgment, he chose to primarily rely on the June 14, 2021 financial statements, which were prepared prior to the commencement of this adversary proceeding.[87]  He testified that he did not believe the August 30, 2022 financial statements were reliable because they had been altered after the litigation had begun.  He made, however, an adjustment to IGL's Profit and Loss Statement to remove a $230,250.00 bad debt from the Heffner embezzlement, as a one-time charge that was not in the normal course of business.

In reaching his opinion as to IGL's value, Nowell assumed the company would continue operating.  He based that assumption on the language in the IGL Redemption Agreement, which alluded to the fact that IGL was going to continue its operations.  In turn, he assigned no impact to the company's value as a result of ICAT's contract termination.  Nowell rejected the Capitalization of Earnings Approach and Market Method Approach, finding these approaches inappropriate for

---

[83] Pl. Ex. 63A.
[84] *Id.* at App. D.
[85] Pl. Ex. 23 at IGL_000089.
[86] Pl. Ex. 29 (Balance Sheet).
[87] Nowell testified that the Profit and Loss Statement reproduced on page 47 of his Amended Report was the Profit and Loss Statement generated on August 17, 2022, which is also shown in Pl. Ex. 26.

this specific valuation because both methods produced a negative valuation number.[88]  Instead, he applied the Adjusted Book Value Method (Going Concern Method), which determines value by adjusting the reported book values of a company's assets to their actual or estimated fair market values and subtracting its liabilities, and estimated that IGL's value as of May 31, 2019 was $5,000.00.  Using adjusted financials from the company's 2020 tax return, financial statements for 2021, and a 1% growth rate to forecast future earnings and then discounting those figures back to the date of valuation, he applied the Discounted Future Earnings Method to estimate that the fair market value of IGL was $13,994,000.00.  To do so, he was required to assume that IGL was a going concern.  He then took the Adjusted Book Value Estimate of Value of $5,000.00 and the Discounted Future Earnings Estimate of Value of $13,994,000.00 and averaged them together to reach his conclusion of value of $6,999,500.00 for a 100% common stock interest of IGL as of May 31, 2019.

Nowell's testimony was overall confusing and at times contradictory regarding the figures used for the "Calculation of the Ongoing Economic Benefit Stream" to determine value based upon the Discounted Future Earnings Method.  For example, he stated that the figures were based upon actual year end 2019 data, but then clarified that he meant 2020 data and stated that there is a typo where it states "Projected Year 2020" on page 52 of Plaintiff's Ex. 63A and it should instead state "Actual Year 2020."  Nowell did not specify how the 2020 Pretax Earnings figure of $943,326.00 was calculated.  He indicated that the information was derived from the 2020 Tax Return, but the Court was unable to locate that figure in the return.  The Court notes that the application of a 1% growth rate to $943,326.00 would not appear to yield $2,131,418 for the following year as indicated on Nowell's calculation.

---

[88] Pl. Ex. 63A.

During cross-examination, Nowell explained that he believed IGL could be considered a going concern despite the loss of the ICAT Agreement because it conducted business that was not covered by the non-compete clause in the ICAT Agency Agreement.  He admitted he did not consider the loss of licenses in his analysis.  When explaining why he relied upon events subsequent to May 2019 to determine the value of IGL as a going concern, Nowell testified that he could not rely on information from management because they had changed the balance sheets to make the company's financials appear worse for purposes of the litigation.  Therefore, in his opinion, management's estimate of what the company was worth had no relevance.  Nowell testified that his valuation was prepared in conformity with and applying the standards set forth in the Statement of Standards for Valuation Services ("SSVS") of the American Institute of Certified Public Accountants ("AICPA Standards") and that he relied on those standards when using data concerning events occurring after the valuation date.  In support for his use of data based on subsequent events, Nowell further testified that he had a prior personal experience during litigation concerning a joint venture agreement entered into by his former employer, Cameron & Barkley Company, where his former firm had taken the position that subsequent data could not be used and the Charleston County judge disagreed and allowed the subsequent data to be used to determine valuation of a company.  Nowell did not provide any other details regarding the case, such as the case number or date when this litigation occurred.

Nowell's opinion that IGL was solvent in May of 2019 depends on the accuracy of financial statements printed on or about June 14, 2021 and the reliability of the methodology and assumptions he employed.  Interestingly, Nowell indicated in his report that his calculation of value would be the same even if the balance sheet from August 2022 was used.[89]  The record

---

[89] Pl. Ex. 63A at 72.

before the Court, including Nowell's testimony, Markel's testimony used to rebut Nowell's valuation, and the authorities relied on by the experts, leads the Court to conclude that the methodology used by Nowell in determining IGL's value, specifically the use of data from the 2020 tax return and financial data from the end of 2019 through 2021, was data and information based on subsequent events not knowable or even foreseeable as of May 31, 2019; thus, it is not generally accepted by experts in the field of valuation.

To support his use of such data, Nowell stated that he relied upon the AICPA Standards. However, as Markel testified, the AICPA Standards provide that subsequent events that are unforeseeable should not be taken into consideration:

> The valuation date is the specific date at which the valuation analyst estimates the value of the subject interest and concludes on his or her estimation of value. Generally, the valuation analyst should consider only circumstances existing at the valuation date and events occurring up to the valuation date." An event that could affect the value may occur subsequent to the valuation date; such an occurrence is referred to as a subsequent event. Subsequent events are indicating of conditions that were not known or knowable at the valuation date, including conditions that arose subsequent to the valuation date. The valuation would not be updated to reflect those events or conditions. Moreover, the valuation report would typically not include a discussion of those events or conditions because a valuation is performed as of a point in time—the valuation date and the events described in this subparagraph, occurring subsequent to that date, are not relevant to the value determined as of that date.[90]

Bankruptcy courts have similarly noted that the use of hindsight analysis when valuing a company's pre-bankruptcy assets is improper. *See, e.g., In re Iridium Operating, LLC,* 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) ("Courts in this jurisdiction may consider post-petition events to some extent under certain circumstances, but reject the use of improper hindsight analysis in valuing a company's pre-bankruptcy assets").[91]    "An expert's disregard for methodology

---

[90]American Institute of Certified Public Accountants, *Statements on Standards for Valuation Services*, at 14 (June 2007), https://www.aicpa.org/resources/download/statement-on-standards-for-valuation-services-vs-section-100.

[91]An article on bankruptcy valuation practice explained the improper use of hindsight in simple terms:

advocated by valuation authorities and typical practice in investment banking and academia shows

that his opinions are not the product of reliable principles and methods." *Id.* (citing *Lippe v.*

*Bairnco Corp.,* 288 B.R. 678, 690 (Bankr. S.D.N.Y. 2003)).

Nowell's use of subsequent data from 2020 and 2021 amounts to the use of hindsight and

events that were not foreseen or known as of May 19, 2019—the date of the transfer at issue in

this case. When pressed on cross-examination, he admitted that his valuation in the current matter

included information that was not knowable, known, foreseen or foreseeable as of May 31, 2019.

After the Redemption Agreements were executed, the global pandemic caused by the COVID-19

virus significantly impacted IGL's revenues by prompting it to expand its operations in the

warehousing and storing business. Logistic Link also combined operations with IGL in 2020,

---

The following are two examples where hindsight would lead to the wrong conclusion. In the first case, assume a business is in a precarious financial condition in January 20XX. The business plan is failing and customer contracts are drying up. The business may be able to operate a month or two at most and would then have to liquidate. A transfer is made in February 20XX. Later that month, the business is awarded a new, unexpected contract by one of its competitor's customers because of a fire suffered by its competitor. The contract is large enough that it keeps the business operating for another 18 months. In 20X1, the business files a bankruptcy petition. The creditors committee brings an action to attack the transfer as fraudulent and seeks to show the business was insolvent in February 20XX.

Based on the facts and circumstances as known or as reasonably foreseeable, as of the transfer date, it appears that the business was not a going concern and that liquidation would be necessary within a month or two. But an unforeseeable subsequent event occurred. The fact that a competitor suffered a fire, thus forcing its customers to seek cover from other sources like the debtor business, was not foreseeable (a valuation expert may use the phrase "known or knowable" and mean the same thing) at the time of the transfer, as of the relevant date. To be sure, the buildings in which businesses are located may catch fire, but that fact does not make the subsequent fire reasonably foreseeable. Subsequent events, like the new contract or continued operations, should be ignored.

In the second case, assume a business is financially stable with modest but sustained growth. A transfer is made in February 20XX. Later that year, a terrorist attack occurs that has a negative impact on the relevant segment of the market, causing all businesses to begin to lose money at an alarming rate. In 20X1, the business files a bankruptcy petition. The creditors committee brings an action to attack the transfer as fraudulent and seeks to show the business was insolvent in February 20XX.

Based on the facts and circumstances as known or reasonably foreseeable as of the transfer date, the business appears to be a going concern. Again, an unforeseeable subsequent event occurred. The fact that a terrorist attack harmed the relevant segment of the market was not reasonably foreseeable at the time of the transfer. The subsequent terrorist event and the failure of the business should be ignored.

Stan Bernstein, Susan H. Seabury, & Jack. F. Williams, *Squaring Bankruptcy Valuation Practice with Daubert Demands*, 16 AM. BANKR. INST. L. REV. 161, 185-86 (Spring 2008).

resulting in a significant increase to its revenues.  IGL's expansion continued well into 2021, when Epps Logistics and Greenway Logistics merged into IGL.  As Burke, Levesque, and Vogel testified, all these events were *not* foreseen or expected in May of 2019.

The Court concludes that Nowell applied flawed methodology.  While Nowell is qualified to provide expert testimony, the Court found his testimony confusing as he at times contradicted himself or could not fully recall what he opined in his report.  His opinion of value does not assist the Court in determining the value of the property transferred and is therefore not relevant.  *See In re Corp. Res. Servs., Inc.,* 603 B.R. 888, 895 (Bankr. S.D.N.Y. 2019) ("Testimony must also be relevant, which means it must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'") (quoting *Daubert,* 509 U.S. at 591-92).  For these reasons, the Court concludes that Nowell's opinion of value of IGL as of May 31, 2019 is inadmissible.  Even if it was deemed admissible, the Court finds it less compelling than Markel's and would give it little to no weight.

## 2.    *Valuation of IGL as of August 21, 2020*

Nowell also prepared a valuation of IGL as of the Petition Date—August 21, 2020 (the "August Report").[92]  The August Report was prepared on November 8, 2022 and amended on October 31, 2023, using the Adjusted Book Value Method – Going Concern, Capitalization of Earnings Method, Discounted Future Earnings Method, and Market Data Method-DealStats.[93] Nowell again used data concerning events occurring subsequent to the valuation date to determine IGL's value under the Discounted Future Earnings Method.  He testified that when applying the Discounted Future Earnings Method, he used the actual data from the 2021 adjusted financials and forecasted forward using a conservative 1% growth rate and then discounted it back to  August 21,

---

[92] Pl. Exs. 64 and 65.
[93] Pl. Ex. 64A. Like the amendment to the May 31, 2019 valuation report, the other two reports were also amended to correct a clerical error identified during his deposition and a math error that Nowell stated did not materially affect the determination of value.

2020. As with the valuation as of the date of the Redemption Agreements, he explained he could

not rely on management estimates for projections, so he used actual data. Nowell again took an

average of the four different estimates of value to determine a final conclusion of value of a 100%

common stock interest of IGL as of August 21, 2020 of $5,108,000.00.[94]

Based upon Nowell's use of subsequent data in the August Report, which the Court has

determined is not a reliable methodology, the Court concludes that August Report and testimony

regarding the August Report is not relevant and therefore inadmissible. As with the Amended

Report, even if deemed admissible, the Court would place little to no weight on its conclusions of

value.

### 3.  *Valuation of IGL as of December 31, 2021*

Nowell's third valuation of IGL was prepared as of December 31, 2021 (the "December

Report"), two months prior to the commencement of this litigation.[95] Nowell's conclusion of value

for a 100% common stock interest of IGL as of December 31, 2021 was $6,189,800.00, using the

same calculation methods that were applied in the August Report, except that it does not appear

that Nowell used subsequent data in making his valuation determination.[96] Nevertheless, the

Trustee has not presented any convincing argument or authority indicating that the calculation of

value of IGL should be made as of this date. The Trustee argues that she is entitled to the "current

value" of a 49% shareholder interest in IGL in lieu of the actual shares. Even assuming the "current

value" would be the appropriate basis to determine the amount to be awarded to the Trustee

pursuant to § 550, which the Court concludes is not, the Court is not convinced that a valuation of

---

[94] The Court notes that Nowell valued IGL at a higher amount as of May 31, 2019, when its financial situation was precarious, yet valued IGL at a lesser amount in August of 2020 when its business had significantly improved, which leads the Court to further question the reliability of Nowell's methodology.
[95] Pl. Ex. 65A
[96] *Id.*

December 31, 2021—more than two years ago from the trial, over a year after Levesque's bankruptcy filing, and approximately two months before this adversary proceeding was commenced—would be relevant to this determination. *See In re Henderson,* 395 B.R. 893, 899 n.11 (Bankr. D.S.C. 2008) (finding that an appraisal from two years prior was not persuasive evidence as to the current value of the property). The Court finds that while the December Report may be admissible, it is not relevant or helpful to decide the issues presented pursuant to § 550; therefore, the Court gives it little weight.

ii.    Markel's Report and Testimony

Defendants engaged Markel, a licensed certified public accountant, to perform a valuation of Levesque's 49% interest in IGL as of May 31, 2019. Markel was engaged on July 1, 2022 by James Burke, on behalf of himself and the other two Defendants, and his valuation analysis of IGL was dated on or about November 14, 2022. In his report, Markel concluded that the fair market value of Levesque's 49% equity ownership interest in IGL as of May 31, 2019 was $0.01.[97] In making this determination, he testified that while he reviewed testimony transcripts of Burke and Levesque's deposition and examination, he did not consider Levesque's and Burke's opinions of the company's value in reaching his own conclusion. Markel's Report was admitted into evidence, except for Appendix B, D, and E, which were not offered, and Appendix I, which the Court took under advisement. Markel mainly took into consideration four different approaches for determining value: the asset-based approach, the market-based approach, the capitalization rate approach, and the income-based approach. Markel's operational premise of value was that IGL could not foreseeably sustain itself as a going concern without an imminent, and significant, infusion of cash. In reaching his conclusion, Markel relied on IGL's balance sheets as of the end

---

[97] Def. Ex. A, App. C.

of each month during the timeframe of October 2018 through May 2019; Profits & Loss Statements for each of the months February 2018, May through December 2018, and January through May 2019; a table prepared by Vogel showing IGL's revenues by customer for the timeframe February 2018 through May 2019;  and the depositions that were taken and documents that were made available concerning IGL.[98]  He also discussed the situation with management, which he testified is customary when conducting this kind of valuation.

Under the asset-based approach, Markel analyzed IGL's balance sheet as of May 31, 2019 (printed on August 17, 2022).  The only adjustment he made to the May 2019 Balance Sheet was moving a loan receivable with a credit balance in the amount of $16,252.11 to the liabilities section.  Unlike Nowell, he did not remove the embezzlement loss from the financial statements as a "one-off" and took into consideration the ICAT contract termination.  His valuation report notes that the May 31, 2019 Balance Sheet shows a deficit in shareholders' equity of $234,726, a deficit in working capital of $78,197, and a current ratio of only 0.64.[99]  Markel concluded that "IGL was clearly within the insolvency spectrum as of May 31, 2019, and could not foreseeably sustain itself as a going concern."[100]  Moreover, because the objective of his valuation was to determine a 49% non-controlling ownership interest in IGL, he rejected the asset-based approach because "a hypothetical willing buyer of the 49% ownership interest could not access the underlying assets, even if (disregarding its obvious insolvency position and going concern issue) some value could be wrung out of those underlying assets."[101]

---

[98] Def. Ex. A, Appx. N.

[99] Def. Ex. A, App. C.  Markel explained that the current ratio is a fraction derived by dividing a company's current assets by its current liabilities.  He further testified that a healthy company would usually have a current ratio between 1.5 to 2.  The Court notes that if the figures from the May 2019 Balance Sheet dated November 15, 2022, were used in the calculation, the current ratio would be approximately 1.8.  Pl. Ex. 24.  However, as explained further herein, even that balance sheet did not take into account the full financial picture of the company as of May 2019.

[100] Def. Ex. A, App. C. at 10.

[101] *Id*. at 10-11.

Markel rejected the market-based approach because he determined that there was insufficient marketplace data to make that analysis.[102] He also rejected the capitalization rate approach because the criteria required to apply this methodology were not present. Lastly, he considered the income-based approach in determining the value of IGL as of May 31, 2019, which he testified is the approach used in most valuations. As Markel explained, one of the basic premises of business valuation is that value is "forward-looking" and the income-based approach embraces this concept by "calculating value based on the assumption that the value of an ownership interest is equal to the sum of the present values of the expected future benefits of owning the interests."[103] Markel testified that this approach can only be applied to a company whose continuity is reasonably assured and whose future income is reasonably probable. In analyzing the expectation that a company is a going concern, Markel explained that both internal and external factors are considered. A history of operating losses as well as unfavorable financial ratios or indicators are usually considered, among other internal factors. Markel's Report states that, as of May 31, 2019, IGL had both operational and external uncertainties that were seriously threatening the enterprise's continued existence.[104] At trial, he testified that in determining that IGL was not a going concern as of May 31, 2019, he considered the monthly Profit & Loss Statements from November 2018 through May 2019, which showed that IGL had sustained net operating losses each month, with the exception of January 2019—regardless of the print date of the Profit & Loss statement.[105] The losses continued in June 2019, following Levesque's redeeming his interest in the company. Moreover, as reflected in the balance sheets, the company had a poor current ratio, negative equity, and negative working capital. As to the external factors,

---

[102] *Id.* at 10.
[103] *Id.* at 11 (internal quotation omitted).
[104] *Id.* at 11.
[105] Pl. Exs. 22 & 28.

Markel noted that a lot of uncertainty resulted from the termination of the ICAT agreement, coupled with a loss of licenses and trucks.[106] For these reasons, Markel concluded that IGL would have been extremely unattractive to a hypothetical willing buyer who had alternative investment opportunities.

Markel also noted other negative conditions that made IGL an unattractive investment, including (1) the fact that IGL needed a significant and immediate infusion of cash to continue operating; (2) a non-competitive covenant with ICAT restricted IGL from approaching former customers acquired through its relationship with ICAT; (3) after the termination of the ICAT relationship, IGL could no longer rely on ICAT's portfolio of transport licenses and could no longer offer a full range of transport services to its customers; (4) IGL lacked proper software to manage customer transactions and track customer shipments due to the termination of the ICAT relationship; (5) IGL's marketplace reputation had been damaged by pejorative statements made by Heffner and Lawrence to IGL's customers and potential customers; (6) the service provided by IGL was not unique; and (7) IGL possessed no intangible assets of discernable value as of May 31, 2019. In making his valuation, Markel did not rely on any data after May of 2019. Markel testified that the use of subsequent data as a substitute for the forecast violates general principles of valuation. He stated that data from after the date of valuation based on events which were unknown or unforeseeable may not be used to determine value. His report cited multiple texts supporting a standard prohibition of the use of hindsight-obtained data in valuing a business.[107]

---

[106] According to Markel, his understanding was that following the termination of the agreement with ICAT, IGL only had licenses to conduct road logistics but lacked the necessary licenses to conduct rail, sea, or air transport which had previously been facilitated through its relationship with ICAT.

[107] Michael A. Paschall, *Back to the Future!*, BUS. VALUATION REV. 57 (June 2002); CONSULTING SERVS. EXEC. COMM., AM. INST. OF CERTIFIED PUB. ACCTS., STATEMENT ON STANDARDS FOR VALUATION SERVICES NO. 1: VALUATION OF A BUSINESS, BUSINESS OWNERSHIP INTEREST, SECURITY, OR INTANGIBLE ASSET ¶ 43 (2007); I.R.S. Rev. Rul. 59-60, 1959-1 C.B. 237 (1959) at *2; HENRY A. BABCOCK, AMERICAN SOCIETY OF APPRAISERS, APPRAISAL PRINCIPLES AND PROCEDURES 128 (1994); GARY R. TRUGMAN, UNDERSTANDING BUSINESS VALUATION 115 (6th ed. 2022); George B. Hawkins, *Why Time Travel in Business Valuation is Wrong,* BUS. VALUATION REV. 126 (Sept.

Due to the negative conditions enumerated above, Markel determined that a hypothetical willing buyer who was fully informed would turn away from this transaction because, as of the valuation date of May 31, 2019, there was significant doubt as to IGL's ability to continue as a going concern. Accordingly, he concluded that under the income-based approach, the fair market value of 100% of IGL's equity as of May 31, 2019, would be zero; thus, the fair market value of Levesque's 49% share at that time would likewise be zero, which must be stated as $0.01 for the report.[108]

The Trustee asserts that the underlying data Markel relied upon to make this conclusion does not reflect the full nature of the facts and circumstances present at the time of the transfer. In reaching his conclusions, Markel made the operational premise of value that "IGL cannot foreseeably sustain itself as a going concern without an imminent, and significant, infusion of cash."[109] The Trustee argues that Markel too heavily relied upon biased statements from IGL's representative, Vogel, and from Burke, to conclude that the negative conditions were present which impacted his valuation. In other words, the Trustee posits that the circumstances were not as dire as Markel was led to believe by Vogel and Burke.

While the Trustee identified some weaknesses in the underpinnings of Markel's Report, including his assumption that IGL could not have been considered a going concern, Markel considered numerous factors to reach his opinion of value. Markel testified at trial that he did not give any of the negative conditions more weight than the others. While his prior deposition testimony reflected that he gave "the loss of ICAT as a customer" condition more weight than anything else, there was evidence supporting his determination that this was a significant factor.

---

2002); Christopher Z. Mercer and Terry S. Brown, *Fair Market Value vs. the Real World,* BUS. VALUATION REV. 21 (March 1999).

[108] Def. Ex. A, App. C, at 11-12. Markel testified that it was his firm's policy to state a valuation of zero as $0.01.

[109] *Id.* at 8.

As a result of the loss of ICAT, IGL had lost its licenses to transport by air, rail and sea, retaining only a license for ground transport, which would significantly impact its business. The Trustee contends that Markel failed to consider that the non-compete clause with ICAT applied only to TTL and only to customers that originated from ICAT, not the many customers that Burke brought to ICAT. According to the Trustee, it was foreseeable that these customers would be recaptured following the ICAT termination, but Markel did not take this into consideration in his valuation.[110] However, Burke testified during trial that it was not foreseeable that IGL would recapture customers following the loss of the ICAT contract, as they had lost access to their customers' emails and had to call on the customers directly to seek their business going forward. At the end of the day, the contract with ICAT was terminated and the future of the company was unstable at best around the time of the transfers at issue. Markel also observed that IGL had been suffering losses for many consecutive months. Markel's testimony was overall credible and ultimately more convincing than Nowell's.

"The grounds for the expert's opinion merely have to be good, they do not have to be perfect. . . . The test of admissibility is not whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research. Rather, the test is whether the particular opinion is based on valid reasoning and reliable methodology." *In re Nellson Nutraceutical, Inc.,* 356 B.R. at 373 (quoting *In re TMI Litig.,* 193 F.3d at 665). Simply stated, valuations are not an exact science. *In re Hayes,* 657 B.R. 519, 528 (Bankr. D.S.C. 2024). While the Court acknowledges there are some weaknesses in Markel's Report, it finds that his opinion reflects a reliable application of the principles and methods to the

---

[110] The Trustee points to Pl. Ex. 9, which shows over $2 million in sales generated from former ICAT customers in 2019 following the termination of the ICAT contract. However, the Court notes that this appears to be subsequent data which would not be properly considered in the valuation determined as of May 31, 2019.

facts of this adversary proceeding and is more persuasive than the Nowell Report for May 31, 2019.

Markel's Report also includes Appendix I, titled "Analysis of Revenue Losses Attributable to ICAT Contract Cancellation in April of 2019," which provides a chart listing customers of IGL and the revenue attributable to each customer for the timeframe beginning January 2018 through March of 2019.[111]   The information was in essence a compilation of customer data provided by Vogel and Burke to quantify and determine the overall effect of losing ICAT as a customer. Markel used this analysis to determine whether ICAT qualified as a principal customer. The analysis concludes that 76% of IGL's revenue stream was tied to the ICAT relationship.  He considered this information to be an integral part of his analysis.

The Trustee objected to the introduction of Appendix I because information summarized in this document was not provided to her during discovery.  Federal Rule of Evidence 705 allows an expert to provide an opinion without first testifying to the underlying facts or data.  Fed. R. Evid. 705.  Moreover, Federal Rule of Evidence 703 allows an expert to base an opinion "on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  The Rule does not require the facts and data to be admissible for the opinion to be admitted "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."[112]   Appendix I appears to be based upon facts and data upon which an appraisal expert would reasonably rely in forming a valuation opinion.  Accordingly, this evidence is admitted, and the Court will give it the proper weight in its analysis.

---

[111] Def. Ex. A, at p. 21.  The information summarized in Appendix I was not included in the other exhibits admitted into evidence.

[112] *Id.*

### c. *Application of the Parol Evidence Rule*

At trial, the Trustee sought the exclusion of any testimony or other evidence of consideration received by Levesque for his ownership interest in TTL and IGL, other than the $10.00 specified in the Redemption Agreements, on the basis that such evidence is barred by the parol evidence rule and the inclusion of the merger clause in the Redemption Agreement.[113]  At trial, the Court ruled it would consider extrinsic evidence because the Redemption Agreements are ambiguous.  *See Parr v. Parr,* 231 S.E.2d 695, 697 (S.C. 1977); *see also Huggins v. Grant (In re Huggins),* 658 B.R. 821 (Bankr. D.S.C. 2024) (finding that parol evidence was admissible despite presence of merger clause where contract was ambiguous).[114]

"The rule is well settled in this State that parol evidence is admissible to show a different consideration from that expressed in a written instrument when language of consideration is intended as a mere recital, but not when it is contractual."  *Iseman v. Hobbs,* 351 S.E.2d 351, 352 (S.C. 1986) (citing cases).  For example, in *Halsey v. Minn.-S.C. Land & Timber Co.,* the South Carolina Supreme Court stated that if "a contract, or deed, stated the consideration to be 'Ten Dollars and other valuable considerations,' it would not be contended that it would be error to

---

[113] The merger clause states: "This agreement contains the entire agreement between the parties hereto regarding the subject matter of this Agreement except as otherwise provided or referenced in this Agreement and supersedes any prior agreement between the parties hereto."

[114] As to the applicable law for parol evidence rulings, in an order issued prior to trial, this Court indicated that North Carolina law would govern issues regarding application of the parol evidence rule in this matter.  ECF No. 63, filed Aug. 18. 2023.  Upon further consideration, the Court finds that it should apply South Carolina law to resolve this issue.  *See In re C and M Investments of High Point Inc.,* No. 13-10661, Adv. Pro. No. 14-02005, 2015 WL 5120819, at *2 (Bankr. M.D.N.C. 2015) (citing *Burns v. Creech,* 350 B.R. 24, 28 n. 4 (Bankr. M.D.N.C. 2006)); *see also* Russell, Bankruptcy Evidence Manual at ¶ 9.1 (2023 ed.) ("When the parol evidence rule is at issue in a bankruptcy proceeding, the bankruptcy court generally must apply the law of the state in which it sits to resolve the issue") (citing cases); *In re Petersburg Regency LLC,* 540 B.R. 508, 545 (Bankr. D.N.J. 2015) ("In applying the parol evidence rule, which is one of substantive contract law, as opposed to a rule of evidence, the bankruptcy court is bound to apply the law of the state in which it sits."); *In re Greater Southeast Community Hosp. Corp. I,* 365 B.R. 315, 318 n.3 (Bankr. D.D.C. 2007).  Moreover, the parties have stipulated that South Carolina law should apply for purposes of the state fraudulent conveyance causes of action.  While the Court will apply South Carolina law in determining whether testimony regarding the additional consideration should be allowed into the record, the Court notes that the parol evidence rule under North Carolina law is substantially the same and finds that analysis under North Carolina law would not change the outcome herein.  *See, e.g., Emp. Staffing Grp., Inc. v. Little,* 777 S.E.2d 309, 313 (N.C. Ct. App. 2015).

admit proof of what constituted 'the other valuable considerations.'"  177 S.E. 29, 33 (S.C.

1934).[115]  *See also Parr v. Parr,* 231 S.E.2d 695, 697 (S.C. 1977) (finding that testimony offered

to explain "other valuable consideration" was simply explanatory and did not vary or contradict

the terms of the deed; therefore, it was not error to admit this evidence).

Here, the Redemption Agreements provide: "In exchange for the Levesque interest,

[IGL/TTL] agrees to pay Levesque the sum of $10.00, contemporaneous with the execution of this

agreement."[116]  Levesque testified that he received $10.00 in exchange for his interest for each

company.  The Redemption Agreements further provide that "in consideration of the premises and

the mutual covenants and agreements herein contained, and *for other valuable consideration*, the

receipt and legal sufficiency and adequacy of which are hereby acknowledged by the parties . . .

."[117]  Accordingly, the Court allowed testimony to be presented at trial as to the "other valuable

consideration" and will consider the evidence to determine the claims asserted.

## II.    Avoidance of Fraudulent Transfers

The Trustee seeks to avoid the transfer of Levesque's ownership interests in IGL and TTL

to Defendants pursuant to § 544(b)(1), as avoidable transfers under South Carolina's Statute of

Elizabeth (S.C. Code Ann. § 27-23-10), and pursuant to § 548(a)(1)(B), as constructively

fraudulent transfers.

### a.   *Section 544(b)(1) - Statute of Elizabeth*

Section 544(b)(1) of the Bankruptcy Code provides, in relevant part:

---

[115] Notably, the South Carolina Supreme Court explained "contractual consideration" as follows:
> As we understand the definition of a contractual consideration it relates to the amount and the manner and means by which, and the time when the consideration is to be paid.  When the consideration is stated to be a fixed sum, the receipt of which is acknowledged, it is merely a recital, and . . . parol testimony is admissible to explain it, if it does not alter the terms of the written instrument.

177 S.C. at 33.
[116] Pl. Exs. 8 and 9.
[117] *Id*. (emphasis added).

Except as provided in paragraph (2), the trustee may avoid any transfer of or interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

Section 544 does not by itself establish a substantive basis for the avoidance of transfers by a trustee; rather, it "gives the Trustee the status of a creditor under state law and allows nonbankruptcy law to determine the rights that accrue as a result of that created status." *In re Oleksy*, 646 B.R. 427, 433 (Bankr. D.S.C. 2022) (quoting *In re J.R. Deans Co., Inc.*, 249 B.R. 121, 129 (Bankr. D.S.C. 2000)).

The Trustee thus seeks to avoid the transfer under the Redemption Agreements pursuant to § 27-23-10 of the South Carolina Code, commonly known as the Statute of Elizabeth, which provides:

Every gift, grant, alienation, bargain, transfer, and conveyance of lands, tenements, or hereditaments, goods and chattels or any of them, or of any lease, rent, commons, or other profit or charge out of the same, by writing or otherwise, and every bond, suit, judgment, and execution which may be had or made to or for any intent or purpose to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, and forfeitures must be deemed and taken (only as against that person or persons, his or their heirs, successors, executors, administrators and assigns, and every one of them whose actions, suits, debts, accounts, damages, penalties, and forfeitures by guileful, covinous, or fraudulent devices and practices are, must, or might be in any ways disturbed, hindered, delayed, or defrauded) to be clearly and utterly void, frustrate and of no effect, any pretense, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding.

S.C. Code Ann. § 27-23-10.  Under § 544, in a bankruptcy case, the trustee succeeds to the rights of an unsecured creditor in existence at the commencement of the case who may avoid the transfer under the Statute of Elizabeth for the benefit of all creditors.  *See In re Hanckel,* 512 B.R. 539, 546 (Bankr. D.S.C. 2014) (noting that a trustee may step into the shoes of creditors and assert rights under the Statute of Elizabeth, "provided there is a 'creditor with a valid unsecured claim in the

bankruptcy case who could assert a claim to avoid the transfer.'") (quoting *Hovis v. Ducate (In re Ducate),* 369 B.R. 251, 258 (Bankr. D.S.C. 2007)).

"Under the Statute of Elizabeth, existing creditors may avoid transfers under an actual fraudulent transfer theory or under a constructive fraud theory."  *In re Genesis Press, Inc.*, 559 B.R. 445, 453 (Bankr. D.S.C. 2016).  Avoidance of a transfer under a constructive fraud theory, which the Trustee is pursuing in this adversary proceeding, does not require proof of actual intent to defraud creditors.  *Id.* at 453 (citing cases).  When a trustee steps into the shoes of a creditor pursuant to § 544 and seeks to avoid a constructively fraudulent transfer under the Statute of Elizabeth, the trustee must establish (1) the transferor/grantor was indebted to the creditor at the time of the transfer; (2) the conveyance was voluntary; and (3) the transferor/grantor failed to retain sufficient property to pay the indebtedness to the creditor in full—not merely at the time of the transfer, but in the final analysis when the creditor seeks to collect his debt.  *Id; see also Friedman v. Wellspring Cap. Mgmt, LLC*, No. 19-80071, 2024 WL 205054, at *12 (Bankr. D.S.C. Jan. 18, 2024).  The burden rests on the Trustee to prove these factors with clear and convincing evidence.  *Fabrica la Estrella S.A. de C.V. v. Banda,* No. 6:05-0466, 2007 WL 39428, at *2 (D.S.C. Jan. 4, 2007); *Friedman*, 2024 WL 205054, at *12 (citing *Oskin v. Johnson*, 735 S.E.2d 459, 463 (S.C. 2012)).

Levesque testified he did not have enough cash to pay his debts at the time of the transfers and that his debts exceeded his assets.  Because it is uncontested that Levesque was unable to pay his debts when due, the Court will focus on whether (1) there is a triggering creditor that gives the Trustee standing to pursue the avoidance action and (2) the Redemption Agreements were voluntary transfers of Levesque's interest in TTL and IGL.

### ii.  Triggering Creditor

As a threshold matter, the Trustee must demonstrate that there is a creditor with a valid unsecured claim in the bankruptcy case who could assert a claim to avoid the transfer in whose shoes the Trustee now stands.  *See* § 544(b)(1); *In re Hanckel,* 512 B.R. at 546.

Here, the Redemption Agreements were executed, and Levesque transferred his ownership interest in TTL and IGL back to the companies in connection therewith, in May of 2019—at a time when Levesque was indebted to various creditors that hold allowable claims in his bankruptcy case.  It is uncontested that at the time of the execution of the Redemption Agreements, Levesque was indebted to Merritt Enterprises, LLC.[118]  As of the Petition Date, Merritt Enterprises, LLC continued to hold an allowable unsecured claim against Levesque as represented in Proof of Claim No. 8 filed in his bankruptcy case.  While the existence of only one creditor is necessary for the Trustee to acquire the necessary standing under § 544(b)(1), the Court notes that it is undisputed that at the time of the execution of the Redemption Agreements, Levesque was also indebted to other creditors, as represented by Proofs of Claim Nos. 4, 5, 6, 7, 9, 14, 15, 17, 19 and 21, who continue to hold allowable unsecured claims against Levesque as of the Petition Date.[119] Accordingly, the Trustee has met this factor.

### iii.  Voluntary Transfers

The South Carolina Supreme Court has clarified that a transfer is "voluntary" when it is gratuitous.  *Royal Z Lanes, Inc. v. Collins Holding Corp.*, 337 S.C. 592, 595, 524 S.E.2d 621, 622

---

[118] *See* Joint Pretrial Order, ECF No. 54, at ¶ 33.

[119] During trial, Defendants objected to the introduction of the proofs of claim on hearsay grounds, despite having stipulated in the joint statement of dispute that there was an existing creditor at the time of the execution of the Redemption Agreements.  The Court overruled Defendants' objections and admitted Exhibits 70 (Proof of Claim #4), 71 (Proof of Claim #5), 72 (Proof of Claim #6), 73 (Proof of Claim #7), 74 (Proof of Claim #8), 76 (Proof of Claim #9), 77 (Proof of Claim #11), 78 (Proof of Claim #12), 79 (Proof of Claim #13), 80 (Proof of Claim #14), 81 (Proof of Claim #15), 82 (Proof of Claim #16), 83 (Proof of Claim #17), 84 (Proof of Claim #18); 85 (Proof of Claim # 19), 86 (Proof of Claim #20), and 87 (Proof of Claim #21).

(1999).  A voluntary conveyance has been further defined as "a conveyance made upon a mere nominal consideration or without consideration." *In re Amelung*, 436 B.R. 806, 810 (Bankr. D.S.C. 2010) (quoting *First State Sav. and Loan Ass'n v. Nodine*, 291 S.C. 445, 450, 354 S.E.2d 51, 54 (Ct. App. 1987)).  "Nominal" is defined as "existing in name only" or, with respect to a price or amount, "trifling, [especially] as compared to what would be expected." *Nominal*, BLACK'S LAW DICTIONARY (11th ed. 2019).  The Trustee cites cases which support this proposition. *See In re Haddock*, 246 B.R. 810, 815 (Bankr. D.S.C. 2000) (concluding that $5.00 plus love and affection was nominal consideration and was therefore a voluntary transfer); *Audio Invs. v. Robertson*, 203 F. Supp. 2d 555, 560 (D.S.C. 2002) (concluding that $10.00 was nominal consideration for transfers of real property and therefore was a transfer "without valuable consideration"); *Erskine v. Erskine*, 92 S.E. 465, 466 (S.C. 1917) (concluding that $10.00 was nominal consideration and therefore did not constitute valuable consideration).  "Valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit, accruing to the one party, or some forbearance, detriment, loss, responsibility given, suffered, or undertaken by the other." *In re Hanckel*, 512 B.R. at 549 (quoting *Furman Univ. v. Waller*, 117 S.E. 356, 358 (S.C. 1923)).

The Supreme Court of South Carolina has specifically rejected the argument that gross inadequacy of consideration causes a transfer to be made without consideration, concluding "gross inadequacy of consideration and 'without consideration' are not synonymous in the law." *Royal Z Lanes*, 524 S.E.2d at 622 (overruling *Dufresne v. Regency Realty, Inc.*, 366 S.E.2d 256 (S.C. Ct. App. 1987)*, which treated a conveyance as voluntary (gratuitous), to the extent that the value of the property exceeded the consideration given).  Gross inadequacy of consideration does not render a conveyance voluntary or gratuitous; rather, the inadequacy of the consideration exchanged for

the transfer of property is treated as a "badge of fraud," and actual intent must be proven. *See In re Hanckel*, 512 B.R. at 548 (citing *Royal Z Lanes*, 524 S.E.2d at 622-23). "Grossly inadequate consideration" has been defined as "a consideration so far short of the value of the property as to arouse a presumption in the mind that the person who takes that property takes it under some kind of secret trust." *Friedman*, 2024 WL 205054, at *13 (quoting *McGhee v. Wells*, 57 S.C. 280, 35 S.E. 529, 531 (1900)). Thus, what is required for a "voluntary" transfer falls below even that threshold. *Id.* (noting that the Statute of Elizabeth analysis only requires some value--something more than nominal consideration--to make the transfers *not* gratuitous; it does not require "fair" value).

Pointing to the language in the Redemption Agreements and Levesque's testimony, the Trustee argues that the evidence shows there was only nominal consideration for the transfer of Levesque's ownership interests in IGL and TTL as only $10.00 was exchanged for what Levesque gave up through the Redemption Agreements. For the reasons set forth above, the Court must look at the transaction as a whole to determine whether Levesque's transfers of his membership interests were voluntary for purposes of the Statute of Elizabeth. *Friedman,* 2024 WL 205054, at *14.

### 1.  Other Consideration

Defendants argue that there was "other consideration" aside the exchange of $10.00 given for Levesque's ownership interest, pointing to the language in the Redemption Agreements referencing "and for other valuable consideration." Specifically, Defendants contend the following constitutes additional consideration for the transfer: (1) Levesque's employment with Logistics Link; (2) forgiveness of a $10,000.00 personal loan from Burke to Levesque; (3) payment of attorney's fees related to the lawsuit with a former co-owner of TTL; (4) forgiveness

of owner distributions taken from IGL; and (5) forgiveness of personal charges made by Levesque on TTL's company credit card.   The Court allowed this evidence to be introduced at trial over the Trustee's objections, but it is not persuaded that they constitute part of the consideration exchanged for Levesque entering into the Redemption Agreements.

<p style="text-align:center"><em>a.    Employment with Logistics Link</em></p>

Defendants assert that Levesque received new employment at Logistics Link as additional consideration for the transfer of his shares in TTL and IGL.   Levesque, however, began working at Logistics Link on April 15, 2019—*prior* to the execution of the Redemption Agreements.   Under North Carolina law, past consideration is not adequate consideration to support a contract.   *Estate of Graham v. Morrison*, 168 N.C. App. 63, 607 S.E.2d 295 (2005).[120]   The testimony fails to show that Burke's assistance with Levesque's employment at Logistics Link was in return for Levesque's transfer of his shares in TTL and IGL, rather than merely a favor for a friend.

While Burke facilitated Levesque's employment with Logistics Link, none of the Defendants had an ownership interest in Logistics Link at that time.[121]   Even if the employment did constitute consideration, it was not consideration from Defendants.   When Levesque began his employment on April 15, 2019, he did not have an employment contract with Logistics Link and earned income on a 1099 basis.   While at trial Levesque testified that the job with Logistics Link was consideration for the Redemption Agreements, he stated during his deposition that there was no additional consideration for the Redemption Agreements beyond the $10.00.   Accordingly, the

---

[120] The same is true under South Carolina law—consideration that is wholly past is not valuable consideration. *See Vieira v. Inman (In re Salyers)*, C/A No. 15-02095-dd, Adv. Pro. No. 15-80146-dd, slip op. at 8 (Bankr. D.S.C. Oct. 14, 2016) (promise founded on past consideration cannot be enforced); *Future Group, II v. Nationsbank*, 324 S.C. 89 (S.C. 1996), *overruled by Paradis v. Charleston County School District* (2021) (on other grounds).

[121] Burke testified that he was a general manager of Logistics Link at that time.

Court is unable to find that Burke's facilitation of Levesque's job with Logistics Link was a negotiated element of consideration for the Redemption Agreements.

    b. *Forgiveness of the $10,000 Personal Loan from Burke to Levesque*

  Defendants argue that Burke forgave a $10,000.00 personal loan to Levesque as consideration for the Redemption Agreements. The evidence regarding this loan was unclear and unconvincing. Levesque testified that he did not recall when the loan was made and whether it was made before or after the Redemption Agreements. He further indicated there were no terms associated with the loan, including no interest rate, payment schedule or deadline for payment, and no written documentation. He was also uncertain as to whether he ever paid the loan back or whether it was forgiven. Burke similarly failed to provide any clarity regarding the personal loan during his testimony, stating only that a personal loan he extended to Levesque was forgiven as part of the consideration for the Redemption Agreements. Moreover, there is no language in the Redemption Agreements that purports to release Levesque personally from any debt or obligation. Based on the record before it, the Court is unable to conclude that forgiveness of a loan was part of the consideration for the Redemption Agreements.

    c. *Payment of Attorney's Fees*

  Defendants contend that payment of Levesque's personal attorney's fees related to the lawsuit against Lawrence was also consideration for the Redemption Agreement. Levesque testified that he thought the legal fees were being paid by TTL and did not recall any specific discussion or agreement regarding their payment. According to Levesque, Burke retained the attorneys to defend them in the litigation, and TTL paid the fees. The TTL Operating Agreement provides that "[t]he Company has the power to defend, indemnify, and hold harmless any Person who . . . was or is a Member . . . , against Expenses . . . , including court costs, reasonable attorney

and expert fees, and any expenses incurred relating to establishing a right to indemnification."[122]

Thus, it appears that TTL had a preexisting obligation under the Operating Agreement to pay

Levesque's attorney's fees.  The evidence presented does not convince the Court that payment of

Levesque's legal fees was negotiated as part of the consideration for the Redemption Agreements.

### d.    *Forgiveness of Owner Distributions*

As additional consideration for the Redemption Agreements, Defendants further maintain

that Levesque was not required to repay owner distributions he received that were in excess of

what he was entitled to receive.[123]    According to Vogel, these draws were also forgiven in

connection with the transfer.  During his direct examination, Levesque acknowledged he had taken

more in distributions than Burke in the early part of 2019 but indicated that he understood he and

Burke would "square up" at some point.  The evidence reflects that Burke did take distributions

later in 2019 totaling $26,500.00. [124]  When questioned at his deposition whether they "squared

up" in the Redemption Agreements, Levesque replied: "No."[125]    Notably, the Redemption

Agreements do not provide for a release of claims or potential claims that the companies might

have had against Levesque.  To the contrary, the only release provided in the Redemption

Agreements is a release of claims (or an acknowledgement that no claims existed) by Levesque as

to any claims *he* might have against the companies.  Thus, the evidence presented fails to

demonstrate that Levesque and Burke contemplated that forgiveness of Levesque's prior owner

distributions was part of the consideration for the Redemption Agreements.

---

[122] Pl. Ex. 5, § 9.1.
[123] It is unclear to what extent the distributions to Levesque were in excess of what he was entitled to receive.  Levesque testified that he never took a distribution without the agreement of Burke.
[124] Pl. Ex. 23 at IGL 000096.
[125] Pl. Ex. 88 at 159, lines 20-25.

e.    *Forgiveness of Personal Charges on Company Credit Card*

Lastly, Defendants argue that Levesque's personal charges on the company credit card were forgiven as consideration for the Redemption Agreements.  Levesque admitted that he used the company credit card for some personal charges.  Vogel testified that Levesque incurred personal credit card charges on one of the company's corporate credit cards in the amount of $372.13 as of March 29, 2019.[126]  Even after transferring his shares in the companies, Levesque continued to incur charges on the company card in July, August, and September of 2019.

At trial, Levesque testified that he was not required to pay back the credit card charges as additional consideration for the Redemption Agreements; however, during his deposition he testified he believed he had repaid those charges and that he did not have a conversation with Burke about the forgiveness of those charges in connection with the Redemption Agreements. Vogel, who was not a party to the contract or a participant in the negotiations for the Redemption Agreements, testified that the personal charges of $372.13 were forgiven as part of the Redemption Agreements.  She recounted having discussions with Levesque after the Redemption Agreements were executed where he stated that $372.13 in personal charges were not required to be repaid under the Redemption Agreement.  However, in Defendants' Answers to Interrogatories, which were admitted into evidence, Defendants stated that the $372.13 in personal charges "was identified as additional personal expenses *after* the redemption agreement had been agreed to."[127] Based on the evidence presented, the Court is unable to conclude that forgiveness of the personal credit card charges was a part of the agreed upon consideration for the Redemption Agreements.

Having reviewed the transaction as a whole and finding that none of the additional consideration asserted by Defendants constitutes valid consideration for the Redemption

---

[126] Def. Ex. G; Pl. Ex. 42.
[127] Pl. Ex. 89, at 6-7 (emphasis added).

Agreements, the Court finds that the only consideration for the Redemption Agreements was the stated sum of $10.00 for each Redemption Agreement.  If the Redemption Agreements only contemplated the transfer of the ownership interests without Levesque's assumption and guarantee of the debt of the companies, the analysis would conclude here.  Under that scenario, the Trustee would not have met her burden under the clear and convincing standard to prove that the TTL transfer was a gratuitous transfer given that the record does not provide any indication that TTL had any value as of the date of the transfer.[128]  As to IGL, the record indicates that it did not appear to be a going concern and even the balance sheet relied upon by the Trustee indicates that IGL had total equity of approximately $5,000 as of the date of the transfers—without taking into account any of the losses.  At most, the $10.00 in consideration would be deemed grossly inadequate consideration, and the Trustee would not have met her burden.  The Redemption Agreements, however, also incorporate the guaranty/indemnification provision; accordingly, the analysis does not end here.

### 2.    Adequacy of Consideration

Even if the membership interests in TTL and IGL had little to no value, Levesque also assumed half of the debts of the companies as part of this transaction, thus receiving a significant detriment in exchange for his interests—taking on liability for debts for which he was not previously responsible.  Despite Levesque's testimony that he believed he was already personally liable for the debts of the company, under the companies' governing documents, he was not in fact liable for those debts and there was no evidence of any consideration to support this guaranty.[129]  Specifically, the Operating Agreement of TTL provided that:

---

[128] The Trustee did include 2017 and 2018 tax returns for TTL as well as a summary of the information from the tax returns in Exhibit 36.  *See* Pl. Ex. 54 and 55.  However, she offered no explanation of how those tax returns might be probative of the value of TTL as of May 31, 2019.

[129] *See* Pl. Ex. 5.

> [A] member will not be bound by, or be personally liable for, the expenses,
> liabilities, debts, contracts or obligations of the Company, except as otherwise
> provided in this Agreement or as required by the North Carolina Limited Liability
> Company Act.  Unless expressly provided in this Agreement, no member, acting
> alone, has any authority to undertake or assume any obligation, debt, or
> responsibility, or otherwise act on behalf of, the Company or any other Member.

With respect to Levesque's liability for the debts of IGL, North Carolina law provides that "a

shareholder of a corporation is not personally liable for the acts or debts of the corporation except

that he may become personally liable by reason of his own acts or conduct." N.C. Gen. Stat. Ann.

§ 55-6-22.

      "A guaranty contract is supported by sufficient consideration if it is based on a benefit

passing to the guarantor or a detriment to the guarantee." *Carolina E. Inc. v. Benson Agri Supply,*

*Inc.,* 310 S.E.2d 393, (N.C. Ct. App. 1984) (citing *Lowndes v. McCabe Fertilizer Co.,* 154 S.E.

2d. 641 (N.C. 1930)).  "When the guaranty . . . involves a pre-existing debt, it must be supported

by some new consideration other than the original debt." *Id.*  In *Future Grp., II v. Nationsbank,*

the South Carolina Supreme Court concluded that a debtor's guarantee of a debt was without

valuable consideration and therefore avoidable under the Statute of Elizabeth because there was

no evidence of any benefit received by the debtor.  478 S.E.2d 45, 49 (S.C. 1996), *overruled by*

*Paradis v. Charleston Cnty. Sch. Dist.,* 861 S.E.2d 774 (S.C. 2021) (overruled on other grounds,

holding that the pleading of special damages for civil conspiracy is not required).  Like *Future*

*Group,* the evidence shows that Levesque received no benefit in exchange for his agreement to

guarantee the debts of TTL/IGL.  IGL's Balance Sheet as of May 31, 2019 indicates that IGL owed

Logistics Link $115,000.00.  By assuming responsibility for 50% of this debt, Levesque became

personally liable for $57,500.00—at a minimum—as a result of the IGL Redemption Agreement.

No evidence was produced, however, regarding TTL's outstanding debts and obligations.  Even if

Markel's opinion of value was fully adopted by the Court, and the Court determined that the value

of IGL's shares was $0.00, it would still constitute a constructively fraudulent transfer due to Levesque's assumption of liability of the debts of the company.[130]  Due to Levesque's guaranty of IGL's debts as part of this transaction, the net effect was that his creditors were in a worse position than they would have been had the transfers not occurred.

Accordingly, the Trustee has demonstrated that Levesque's transfer of his shares in IGL was for the nominal consideration of $10.00 and thus was a voluntary transfer.  Therefore, the Court finds that the criteria for avoidance of the IGL transfer as constructively fraudulent under the Statute of Elizabeth are satisfied and the Trustee is entitled to judgment in her favor on the fourth cause of action pursuant to § 544 and  S.C. Code Ann. § 27-23-10.  Without evidence of TTL's value or its debts, however, the Court is unable to determine whether Levesque's transfer of his membership interest in TTL was a voluntary transfer.[131]  Judgment is therefore granted in favor of Defendants as to the first cause of action—Avoidance of TTL Transfer pursuant to § 544 & S.C. Code Ann. § 27-23-10, but is granted in favor of the Plaintiff as to the fourth cause of action—Avoidance of IGL Transfer pursuant to § 544 & S.C. Code Ann. § 27-23-10.

### b.  *Section 548(a)(1)(B) – Constructive Fraud*

Given that the Court finds in favor of the Trustee as to the § 544 claim as to IGL, consideration of her claims under § 548(a)(1)(B) is not ultimately necessary, as the result under § 550 would be the same.  Regardless, it was raised as a separate claim; thus, it will be briefly addressed.  Section 548(a)(1)(B) provides in relevant part as follows:

> The trustee may avoid any transfer . . . of an interest of the debtor in property…
> that was made … on or within 2 years before the date of the filing of the petition,
> if the debtor voluntarily or involuntarily . . . received less than a reasonably

---

[130] Defendants did not specifically address this issue.  When questioned about the impact of Levesque's assumption of the guarantee, Defendants' counsel stated that it was evidence that the parties understood there was little likelihood that IGL would continue going forward and that the provision was intended to equalize the owners' respective liabilities in the event that Burke had to come out of pocket for the debts of the company in the future.

[131] As set forth above, it also appears that TTL has since dissolved, so any recovery would in essence be valueless.

equivalent value in exchange for such transfer . . .  and was insolvent on the date
that such transfer was made . . . or became insolvent as a result of such transfer.

§ 548(a)(1)(B).  To recover under this section, the Trustee must establish that: (1) the transfer was

made by Levesque; (2) the transfer occurred within 2 years of the Petition Date; (3) Levesque

received less than reasonably equivalent value in exchange for the transfer; and (4) Levesque was

insolvent at the time of the transfer or became insolvent as a result of such transfer.  *See In re*

*Ducate,* 369 B.R. at 264-65.  There is no question that the transfers at issue were made by Levesque

within two years of the Petition Date.  Moreover, Levesque admitted during trial that his liabilities

exceeded his assets at the time of the transfers of his membership interests; therefore he was either

insolvent at the time of the transfers or became insolvent as a result of the transfers.  *See* 11 U.S.C.

§ 101(32).  Accordingly, the only disputed element of this claim is whether Levesque received less

than a reasonably equivalent value in exchange for the transfers.

When evaluating an avoidable transfer claim under § 548(a)(1)(B), the Fourth Circuit has

explained that the determination of "reasonably equivalent value" requires the court to "focus…on

the consideration received by the debtor, not on the value given by the transferee."  *In re Jeffrey*

*Bigelow Design Grp., Inc.*, 956 F.2d 479, 484 (4th Cir. 1992) (quoting Jack F. Williams, *Revisiting*

*the Proper Limits of Fraudulent Transfer Law*, 8 BANKR. DEV. J. 55, 80 (1991)).  The burden of

demonstrating that the Debtor did not receive reasonably equivalent value for the transfer lies with

the Trustee.  *Architectural Glass Constr., Inc. v. Anderson (In re Pfister),* No. 7:12-cv-01825-

HMH, slip op. at 10 (D.S.C. Oct. 10, 2014) (citing *In re Ducate,* 369 B.R. at 265).

Courts have applied a two-step inquiry to determine reasonably equivalent value: (1) did

the debtor receive value and (2) was the payment reasonably equivalent to the value extended?

*Smith v. Diseveria (In re BK Racing),* No. 18-30241, slip op. at 30 (Bankr. W.D.N.C. Mar. 11,

2024) (citing cases); *Fort v. Luxor Sci., LLC (In re Labsource, LLC),* 632 B.R. 724, 729 (Bankr.

D.S.C. 2021). For the same reasons discussed above regarding the Trustee's § 544 claims, the Court finds that the Trustee has demonstrated that Levesque did not receive reasonably equivalent value in exchange for the transfer of his membership interest in IGL.  Again, no evidence of value of TTL or the amount of TTL's debts was introduced into evidence and the Court is thus unable to determine the net effect of that transfer on the Debtor's estate.  Therefore, the Trustee has failed to meet her burden of proof that Levesque did not receive reasonably equivalent value for the transfer of his interest in TTL.  Thus, the Trustee is entitled to judgment in her favor as to the fifth cause of action pursuant to § 548(a)(1)(B), and Defendants are entitled to judgment in their favor as to the second cause of action.

## III.    <u>Recoverability of Transfers Under § 550</u>

Once a fraudulent or constructively fraudulent transfer of property has been avoided, the trustee may recover such property or the value or proceeds of such property for the benefit of the bankruptcy estate.  *In re Labsource, LLC*, 632 B.R. at 729.  Section 550 sets forth the rights and liabilities of a transferee of an avoided transfer, providing:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, *or*, *if the court so orders*, the value of such property, from—
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.

§ 550 (emphasis added).  Under § 102(5), the term "or" is not exclusive. "Thus, if the specific property cannot be recovered, a bankruptcy court may enter a money judgment against the transferee for the value of the property in order 'to restore the estate to the financial condition that it would have enjoyed if the transfer had not occurred.'"  *Manchester v. Sharpton (In re All-Phase Roofing and Constr., LLC),* No. 17-12414, Adv. No. 17-01070, 2020 WL 374357, at *10 (Bankr.

W. D. Okla. Jan. 17, 2020) (citing *Weinman v. Fid. Cap. Appreciation Fund (In re Integra Realty Res., Inc.),* 354 F.3d 1246, 1266 (10th Cir. 2004)).  The Court may alternatively award the value of the property transferred or return the property.

The Court has the discretion to determine which of the alternative forms of relief to grant— whether to allow the recovery of the property *or* its value.  *See In re Pfister*, No. 09-05670, Adv. Pro. No. 10-80162, 2012 WL 1144540, at *6 (Bankr. D.S.C. Apr. 4, 2012), *aff'd*, 749 F.3d 294 (4th Cir. 2014); *D.A.N. Joint Venture III LP v. Touris*, 597 B.R 411 (D. Ill. 2019).  The Bankruptcy Code does not provide guidance on when a court should order a monetary judgment as opposed to the return of the transferred property—the only direction expressly mentioned in § 550 is that "[t]he Trustee is entitled to a single satisfaction."  11 U.S.C. § 550(d); *see also In re Hanckel*, 2015 WL 8607388, at * 13; *In re Veluchamy,* 879 F.3d 808, 822 (7th Cir. 2018); *In re Kudzu Marine, Inc.,* 569 B.R. 192, 211 (Bankr. S.D. Ala. 2017); *In re Berley Assoc. Ltd.,* 492 B.R. 433, 443 (Bankr. D.N.J. 2013).

Courts have considered various factors in determining whether to order turnover of the property at issue rather than the payment to a trustee of its value, including whether the value of the property is contested or readily determinable, or whether the value diminished by conversion or depreciation.  *See In re Gordos Rest. Corp.,* 643 B.R. 1, 36 (Bankr. S.D.N.Y. 2022); *In re Kudzu Marine, Inc.*, 569 B.R. at 211.  As the Fourth Circuit has previously noted, the language of § 550(a) expresses "'a congressional intent to return the property transferred unless to do so would be inequitable.'"  *In re Pfister,* 2012 WL 1144540, at *6 (quoting *In re Broumas*, 135 F.3d 769 (table), 1998 WL 77842, at *6 (4th Cir. 1998)).  Fraudulent conveyance actions are deemed equitable in nature.  *See Ashmore v. Cook*, No. 3:13-1449, 2013 WL 6283508, *3 (D.S.C. Dec. 4, 2013) (citing *Oskin*, 735 S.E.2d 459 at 463).  In equity, a court has the authority to "mould each decree to the

necessities of the particular case." *PSC Nitrogen, Inc. v. Ross Dev. Corp.,* 126 F. Supp. 3d 611, 642 (D.S.C. 2015).

The remedy of turnover of Levesque's interest in IGL—a 49% minority—does not fit comfortably within the intent of § 550. The purpose of the Bankruptcy Code's avoidance provisions is to put the estate in the same position as it would have been but for the transfer. *See In re All Phase Roofing and Constr., LLC*, No. 17-12414, 2020 WL 374357, *13 (Bankr. W.D. Okla. Jan. 17, 2020). Stated differently, the focus should not be on what the transferee gained but rather on what the estate lost as a result of the transfer. *See id.* at *16; *see also In re Derivium Cap. LLC*, 716 F.3d 355, 361 (4th Cir. 2013) ("The purpose of the Bankruptcy Code's avoidance provisions is to prevent a debtor from making transfers that diminish the bankruptcy estate to the detriment of creditors.").

The facts of this case and the record before it lead the Court to decide that the Trustee should be allowed to only recover the value of the interests transferred through the Redemption Agreements. The Trustee acknowledged as much when stating in her closing brief that "[u]nder the circumstances of this case, it is appropriate for the court to instead award to the Trustee the value of such property, i.e., the value of 49% shares in IGL."[132] Moreover, to the extent that the 49% interest in IGL is turned over to the Trustee, that in itself would lead to a whole new set of issues involving the liquidation of the interest, likely resulting in further protracted litigation regarding any increase in the value which was solely related to Burke's efforts. Considering the litigation fees and expenses the Trustee has already incurred in litigating this protracted adversary proceeding, the Court is concerned that the Trustee's administrative claim may be approaching— if not already exceeding—the unsecured claims asserted in this case. Accordingly, any further

---

[132] ECF No. 82, at 27.

litigation would cause the administrative claims to soar and increasingly dwarf the recovery to the unsecured pool.[133]

Simply stated, the Trustee's recovery of the 49% minority interest in IGL would lead to an inequitable result.  The record before the Court indicates that IGL's financial wherewithal is currently sound and profitable compared to when Levesque was also an owner.  Its shares have increased in value as a result of diversification and expansion of its business to include warehousing services and through its mergers with three separate entities.  The evidence reflects that IGL is a completely different company than it was in May of 2019 and its financial soundness appears attributable to Burke's post-transfer efforts as well as events that unraveled post-transfer which were unforeseen.  The Redemption Agreement was essentially a combination of an assumption of debt/indemnification and transfer of ownership interest.  As stated above, if the Redemption Agreement had included only the transfer of ownership interest, the Court would have found that there was no voidable transfer.  It was the assumption of debt that allowed the Trustee to prevail on the record before the Court.  Notably, however, while Levesque assumed liability for debts he had no obligation to assume, the Defendants never called that debt or sought payment from Levesque, and the debt is now discharged.[134]  Under the facts of this case, a transfer of the IGL shares to the Trustee would result in a windfall to the Trustee.  *In re Pfister*, 749 F.3d at 297 ("Although a trustee may reclaim a property interest that the bankrupt debtor has owned in the past, the trustee may not reclaim a *greater* property interest than that which the debtor actually

---

[133] Notably, assuming the book value of IGL is in the millions of dollars, the transfer of 49% of the shares to the Trustee would possibly result in a recovery of millions of dollars from the sale of the shares, the remainder of which would ultimately be paid back to Levesque.  The total of unsecured creditors' claims in this case is in the ballpark of between $100,000.00 - $200,000.00, and the Trustee has already recovered approximately $78,000.00 for the benefit of the estate.  *See supra n.*49.

[134] Order Discharging Debtor (ECF No. 33, C/A No. 20-03330).

owned."). Accordingly, the Court exercises its discretion to instead award the value of the shares

to the bankruptcy estate.[135]

### a. *Determination of Valuation Date*

To award the value of the ownership interest in IGL to the bankruptcy estate, the Court

must first select the proper date upon which to determine the value of the shares. Courts differ on

when valuation of property recovered pursuant to § 550 should occur. *In re Hanckel,* 2015 WL

8607388, at *13. The Fourth Circuit has not yet provided guidance on this issue. *Id.*

Some courts have held that "[t]he market price at the time of the transfer is the proper

measure of § 550 damages." *In re Ruvalcaba,* No. 16-82572, 2018 WL 2317682, at *19 (Bankr.

N.D. Ill. May 18, 2018) (quoting *In re McLaughlin,* 183 B.R. 171, 176-77 (Bankr. W.D. Wis.

1995)); *see also In re Veluchamy,* 879 F.3d at 823-24 (finding that a bankruptcy court did not

abuse its discretion or commit clear error in deciding to award the value of property transferred

determined as of the date of the transfer); *Tidwell v. Chrysler Credit Corp. (In re Blackburn),* 90

B.R. 569, 573 (Bankr. M.D. Ga. 1987). Others have found that the valuation date should be

determined based upon the circumstances of the case. *See, e.g., Weinman v. Fidelity Capital

Appreciation Fund (In re Integra Realty Resources, Inc.),* 354 F.3d 1246, 1266 (10th Cir. 2004)

(stating that "the only generally applicable rule in regard to § 550(a) valuation is that the time at

which the value is measured depends upon the circumstances of the case") (internal quotations

omitted); *In re Gordos Rest. Corp.,* 643 B.R. at 36 (noting that the valuation date depends on the

---

[135] In the Joint Pretrial Order (ECF No. 54), the Trustee requested that if a judgment was rendered in her favor on the § 550 claim, the Court allow her the opportunity to separately brief the recovery to be awarded to the Trustee pursuant to that section. The parties were given a chance to brief closing arguments and in her closing brief, the Trustee asks for the value of 49% shares in IGL and seeks value of $3,033,002.00 based upon taking 49% of Nowell's $6,189,800.00 valuation of IGL as of December 31, 2021. ECF No. 82, at 27. The evidence is closed, and the valuations have been presented to the Court and taken into consideration to the extent stated herein. The Court does not see any reason—or benefit for that matter—to allow any further briefing or hold any further hearing on the issue of recovery.

facts, including whether there is post-transfer appreciation in value, value added in good faith, and

danger of either party receiving a windfall); *In re Seitz,* 400 B.R. 707 (Bankr. E.D. Miss. 2008)

(finding that limiting the trustee's recovery to the value as of the transfer date would punish the

estate and its creditors by depriving them of the appreciation in value and allowing bad faith

transferees to capture it, and further concluding that the value should be determined as of the date

of the judgment for recovery).  As this Court previously noted, "it is important for trial courts to

have broad discretion in valuing property or ordering recovery since the avoidance of transfers can

range from conveyances to the innocent to conspiracies intended to defraud creditors and thus, the

timing of the valuation can be important."  *In re Hanckel*, 2015 WL 8607388, at *13.

The Court has been presented with evidence of IGL's value from May 31, 2019, August

21, 2020 (the Petition Date), and December 31, 2021.  As discussed above, Nowell's May 31, 2019

and August 21, 2020[136] reports were not admitted into evidence and, even if they were deemed

admitted, the Court would give them little to no weight as it found Markel's Report more

convincing.  Even if Nowell's conclusion of value of IGL as of December 31, 2021 was determined

to be relevant, the Court finds that valuation as of that date would result in a windfall to Levesque

and lead to further possible litigation with Burke, who would likely seek recovery of the

appreciation in value as a "good faith transferee" under § 550(e).[137]  Burke's efforts following the

---

[136] Pl. Ex. 64A.

[137] Section 550(e) provides:

> A good faith transferee from whom the trustee may recover under subsection (a) of this section has
> a lien on the property recovered to secure the lesser of (A) the cost, to such transferee, of any
> improvement made after the transfer, less the amount of any profit realized by or accruing to such
> transferee from such property; and (B) any increase in the value of such property as a result of such
> improvement of the property transferred.

The Court notes that § 550(e) does not appear to require that an initial transferee take for value to be able to claim a
lien on the property recovered by the trustee—only that they are a "good faith transferee." *See In re Teleservices Grp.,
Inc.,* 444 B.R. 767, 812 (Bankr. W.D. Mich. 2011) ("Section 550(e) indicates that value and knowledge of avoidability
are irrelevant with respect to any transferee, including even an initial transferee, with respect to improvements to the
property transferred.  All that is required of the transferee in that circumstance is, again, that he be in good faith.")

transfers improved the company by significantly increasing its revenues and expanding its business, which in turn increased the value of the business. The evidence indicates that the value of IGL's shares substantially increased in 2020 under Burke's leadership due to his decisions to merge with Logistics Link and expand IGL's business to include warehousing as demand for those services increased during the pandemic.

The Trustee has not demonstrated that Nowell's valuation report as of December 31, 2021 has any relevance to the determination of value herein; thus, the Court declines to use that date for valuation purposes. There is no recent evidence of value before the Court and therefore it cannot use the date of judgment as the valuation date. The Court further finds it would be inequitable to use the judgment date because there have been too many intervening factors affecting the value of IGL since Levesque transferred his shares in the company. *See In re Pfister,* 2012 WL 1144540 (Bankr. D.S.C. 2012) (noting that several transactions had occurred since the transfer that interfered with the practicality of avoiding the transfer and therefore the appropriate remedy was to enter a money judgment against the defendant for the value of the property at the time of the transfer). Moreover, based on the record before the Court, including Burke's testimony that he was unwilling to go forward with IGL's business if he did not have 100% ownership of the company, it is questionable whether IGL would have continued in business at all if the Redemption Agreements were not executed. Under the circumstances of this case, the Court finds that the date the Redemption Agreement was entered into—May 31, 2019—is the appropriate date to determine the value of the property transferred.

**b.** *Calculation of Value*

The only evidence of value of IGL as of May 31, 2019 that was admitted into evidence was Markel's Report and the financial statements of IGL. As analyzed earlier, all financial statements

have some inherent flaws.  The Court admitted Markel's Report, deeming it more compelling and founded on sounder methodology; nonetheless, as indicated above, the Court has reservations regarding the underlying data.  Given the different versions of the financial documents, depending on the date they were printed, the Court concludes that they all have sufficient indicia of trustworthiness but acknowledges their shortcomings and flaws.  The Court is left with having to reach its own valuation while considering all the evidence before it.  After considering the multiple versions of the financial statements presented into evidence, it will rely on the Balance Sheet as of May 31, 2019, with a print date of November 15, 2021, to determine the value it will award the Trustee.[138]

The Liabilities & Equity portion of that Balance Sheet reflects Total Equity of $4,813.88.  It also reflects a loan payable to TTL in the amount of $50,528.84, which the Court finds should be removed as a liability due to a purported merger of the two companies.  While that Balance Sheet does not take into account the losses incurred as a result of the alleged embezzlement and other bad debts, it also does not account for any possible claim IGL had against Heffner, including possible restitution claims which would probably offset the losses.  Taking all that into account results in 100% of shareholder equity in IGL of $55,342.72 as of May 31, 2019.[139]  As Levesque owned only a 49% interest in IGL, that number must be reduced by 49% to $27,117.93.  Both experts testified that valuation of a minority interest in a corporation cannot be determined merely by taking 49% of the total value of shareholder equity and that normally a minority interest discount should also be applied.  Markel testified that a minority interest discount between 30 and 50% would be appropriate because a minority interest owner cannot access the actual assets of the

---

[138] Pl. Ex. 24.

[139] To be clear, this calculation is solely for determining the value for purposes of § 550 and is not intended to change the analysis above and the findings as to the reliability or admissibility of the experts' reports.

company.  The Court agrees that a minority interest discount of 50% is appropriate here.  Again, valuations are not an exact science—this case has presented unique challenges due to the quality of the data presented, the inadmissibility of an expert's report, and the significant growth and changes to the companies following the transfers.  Accordingly, the Court concludes that the value of Levesque's 49% interest in IGL as of May 31, 2019 is $13,558.97.  The parties stipulated that IGL was the initial transferee.  Accordingly, the Trustee may recover that amount pursuant to § 550(a)(1) from IGL.

## IV.     Breach of Fiduciary Duty by Burke

The Trustee claims that Burke, as majority shareholder, owed a fiduciary duty to Levesque, as minority shareholder, to act in good faith and to not take actions that personally benefited himself to the detriment of the minority shareholder.  The Trustee stands in the shoes of the Debtor, and therefore may assert any claims that Levesque may have against Burke as of the commencement of the case.  *In re Ladd,* 516 B.R. 66, 77 (Bankr. D.S.C. 2014) ("As a chapter 7 trustee, Plaintiff takes only such rights as the debtor had in the property under state law.") (quoting *Drake v. Franklin Equip. Co. (In re Franklin Equip Co.),* 418 B.R. 176, 210 (Bankr. E.D. Va. 2009)).  Under North Carolina law, a minority shareholder may bring an individual claim against a majority shareholder for breach of fiduciary duty.  *Norman v. Nash Johnson & Son's Farms, Inc.,* 537 S.E.2d 248 (N.C. Ct. App. 2000).  "To establish a claim for breach of fiduciary duty, claimants are required to produce evidence that (1) [the] defendant[] owed them a fiduciary duty of care; (2) [the] defendant[] violated [his] fiduciary duty; and (3) this breach of duty was a proximate cause of injury to [the] plaintiffs."  *Smith v. Smith,* 846 S.E.2d 819, 825 (N.C. Ct. App 2020) (quoting *French Broad Place, LLC v. Asheville Sav. Bank, S.S.B.,* 816 S.E.2d 886, 899 (N.C. Ct. App. 2018)).

As to the first element, the Trustee must establish that there is a fiduciary relationship between the parties. *Azure Dolphin, LLC v. Barton,* 821 S.E.2d 711, 725 (N.C. 2018). "[A] fiduciary relationship is generally described as arising when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* (citing *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) (internal quotations omitted). North Carolina courts have explained that a fiduciary relationship "extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Dalton v. Camp,* 548 S.E.2d 704, 707-08 (N.C. 2001) (citing cases). "In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders." *Bickley v. Fordin,* 811 S.E.2d 671, 676 (N.C. Ct. App. 2018) (quoting *Freese v. Smith,* 428 S.E.2d 841, 847 (N.C. Ct. App. 1993)). "Once a minority shareholder challenges the actions of the majority, the burden shifts to the majority to establish the fairness and good faith of its actions." *Freese v. Smith,* 428 S.E.2d at 847. It is undisputed that Burke, as the holder of 51% of the voting shares in IGL, was at all times the controlling, majority shareholder of IGL, and that Levesque was the minority shareholder. Accordingly, this element appears to be satisfied.[140]

---

[140] Under North Carolina law, directors of a corporation do not owe a fiduciary duty to the creditors of the corporation. *Kaplan v. O.K. Techs., L.L.C.*, 675 S.E.2d 133, 139 (N.C. Ct. App. 2009); *Keener Lumber Co. v. Perry*, 560 S.E.2d 817, 822 (N.C. Ct. App. 2002); *Oberlin Capital, L.P. v. Slavin*, 554 S.E.2d 840, 845, 847 (N.C. Ct. App. 2001); *Whitley v. Carolina Clinic, Inc.*, 455 S.E.2d 896, 899 (N.C. Ct. App. 1995). The Court notes that the fiduciary duty of a director shifts to the creditors when a corporation becomes insolvent. *See Fed. Deposit Ins. Corp. v. Sea Pines Co.,* 692 F.2d 973, 976-77 (4th Cir. 1982), *cert. denied,* 461 U.S. 928 (1983). The case law is unclear whether insolvency would shift the fiduciary duty of a majority shareholder to the creditors and relieve the majority shareholder of its fiduciary duty to the minority shareholder. "However, no duty is owed to creditors, even if the corporation is balance sheet insolvent, when the directors and officers are acting in good faith in running the business." *In re Bostic Const., Inc.,* 435 B.R. 46, 62 (Bankr. M.D.N.C. 2010) (citing cases). Here, the evidence indicates that Burke was acting in good faith in running the business, so it does not appear that his fiduciary duties would have shifted to the creditors.

Second, the Trustee must demonstrate a breach of fiduciary duty. The Trustee argues that Burke breached his fiduciary duty to Levesque when he received the transfer of Levesque's shares for the nominal amount of $10 while also requiring Levesque to (1) guarantee 50% of the company's debts, (2) indemnify Burke for 50% of any debt that Burke guaranteed, and (3) indemnify Burke for 50% of all Logistics Link loans. "Once a minority shareholder challenges the fairness of the actions taken by the majority, the burden shifts to the majority to establish that its actions were in all respects inherently fair to the minority and undertaken in good faith." *Farndale Co., LLC v. Gibellini,* 628 S.E.2d 15, 20 (N.C. Ct. App. 2006) (citing cases). Burke testified that he was simply carrying out Levesque's request to relinquish ownership of his shares. There is no evidence indicating that Burke acted with a lack of good faith. Burke testified that he facilitated Levesque getting a job at Logistics Link because he was aware that Levesque's wife wanted him to have dependable income and wanted to help him out. Levesque testified that he believed Burke was honest and did not harm him regarding the transfer. Both Burke and Levesque testified that there was a lot of uncertainty at the time of the transfer regarding whether IGL would be able to recapture its customers and mitigate its losses as a result of the termination of the ICAT contract, and therefore they both believed Levesque's interest in the companies was worth $0.00 at the time of the transfer. As evidence of Burke's breach of fiduciary duty, the Trustee points to Burke requiring Levesque to assume debts for which he was not previously responsible. There is no indication that Levesque felt forced by Burke to sell his shares back to IGL. The Court finds that there is insufficient evidence indicating that Burke breached his fiduciary duty to Levesque. Moreover, even if requiring Levesque to assume the debts of the companies was a breach of fiduciary duty, there are no damages to the estate, as Levesque was never required to pay those

debts and they were discharged in his bankruptcy.  In light of this finding, the Trustee's claim for

breach of fiduciary duty is denied.

## **CONCLUSION**

Based upon the foregoing, it is hereby ORDERED that:

1. Judgment is granted in favor of the Defendants TTL and Burke as to the first cause of action, Avoidance of the TTL Redemption Agreement Pursuant to § 544 & S.C. Code § 27-23-10;

2. Judgment is granted in favor of Defendants TTL and Burke as to the second cause of action, Avoidance of the TTL Redemption Agreement pursuant to § 548(a)(1)(B);

3. As the parties stipulated that South Carolina law governs the Trustee's fraudulent transfer claims under state law, judgment is granted in favor of Defendants TTL and Burke as to the third cause of action, Avoidance of the TTL Redemption Agreement Pursuant to § 544 & N.C. Uniform Voidable Transactions Act;

4. Judgment is granted in favor of the Trustee as to the fourth cause of action, Avoidance of the IGL Redemption Agreement Pursuant to § 544 & S.C. Code § 27-23-10;

5. Judgment is granted in favor of the Trustee as to the fifth cause of action, Avoidance of the IGL Redemption Agreement Pursuant to § 548(a)(1)(B);

6. As the parties stipulated that South Carolina law governs the Trustee's fraudulent transfer claims under state law, judgment is granted in favor of Defendants IGL and Burke as to the sixth cause of action, Avoidance of the IGL Redemption Agreement Pursuant to § 544 & N.C. Uniform Voidable Transactions Act;

7. Judgment is granted in favor of the Trustee as to the seventh cause of action, Recovery of Avoided Transfer Pursuant to 11 U.S.C. § 550. The Trustee may recover from IGL the value of Levesque's 49% interest in IGL as of May 31, 2019, in the amount of $13,558.97.

8. Judgment is granted in favor of Defendant Burke as to the eighth cause of action, Breach of Fiduciary Duty.

**AND IT IS SO ORDERED.**